[Crim. No. 296. Fourth Appellate District.—May 29, 1936.]

THE PEOPLE, Respondent, v. JAMES HERVEY JOHNSON, Appellant.

374

Edgar A. Luce, Robert R. Hamilton and Don L. Yale for Appellant.

U. S. Webb, Attorney-General, John O. Palstine, Deputy Attorney-General, and Thomas Whelan, District Attorney, for Respondent.

BARNARD, P. J.—The defendant, who was the assessor of San Diego County, was charged with a violation of subdivision 6 of section 424 of the Penal Code, it being charged that he wilfully omitted to transfer to the county treasurer the sum of $356.40 which he had collected from various persons as taxes on personal property and when it was his duty, under the law, to transfer said money to the treasurer. He was tried by the court without a jury and, after being found guilty, his application for probation was granted. He gave notice of appeal from the judgment and also from an order denying his motion for a new trial. ▮ Because probation was granted no judgment was entered and the purported appeal from such judgment should be dismissed, although the case is before us on the appeal from the order denying a new trial. (*People* v. *Von Eckartsberg*, 133 Cal. App. 1 [23 Pac. (2d) 819].)

With one exception, which will hereafter be referred to, there is no dispute as to the facts in the transaction which led to the conviction of the appellant. On March 6, 1934, an agent for the receiver of a theatre paid to the appellant, as county assessor, $1,021.68 in payment of the tax on certain personal property in the theatre, in accordance with an assessment made by the appellant. This tax was paid under protest on the ground that an excessive valuation had been placed on the property. In making this assessment the regular form

used in assessing unsecured personal property had been filled in. On March 7, 1934, this $1,021.68 was deposited in the office of the county treasurer on account of personal property tax collections and that particular money was never withdrawn for the purpose of making a refund to this taxpayer. The appellant had agreed with the agent of the receiver to have the property reexamined and reappraised and sent a deputy for that purpose. This deputy made a report that the assessment was too high and recommended that it be reduced by $6,000. A correction was made on the assessment roll, which was still in the hands of the asssessor, by enclosing the original assessment figures in a circle in red ink and by writing in the reduced assessment figures, which thus showed a tax of $665.28 in lieu of the original tax of $1,021.68. On April 3, 1934, the agent of the receiver appeared at the cashier's window in the appellant's office and requested a return of the amount due him. The cashier appeared to know nothing about the matter and left his window for some five or six minutes. When he returned he handed the agent $356.40 in cash. The old receipt for $1,021.68 was taken up and pasted in the receipt book over the carbon copy of the same and a new receipt was issued to the taxpayer for $665.28. The money thus returned to the taxpayer was taken out of the till and was money which had been paid in by other taxpayers on April 3d, and the day before. Complete entries were made on the assessor's books which fully disclosed the entire transaction and on the assessment roll, which was finally turned over, the appellant was charged with $665.28 with respect to this assessment and not with $1,021.68.

It is appellant's contention that the evidence is not sufficient to show that he authorized the making of this refund in the manner in which it was made, and in this connection appears the only conflict in the evidence. He testified that he did not authorize the cashier to make this refund by paying cash out of the till, that he had never instructed anyone in his office to make a refund by paying money out of the drawer except by way of making change, and that although he approved the reduction of this assessment his instruction was that the refund should be handled in accordance with "Refund Form No. 232", which contemplated a submission of the matter to the board of supervisors under the provisions

of section 3804 of the Political Code. On the other hand, it appears that the agent of the receiver had talked personally to the appellant protesting the amount of this assessment both before the assessment was originally made and after the tax was paid, and appellant had agreed to have the matter investigated. It does not appear how the receiver's agent was informed that a refund was to be made but it does appear that he knew this when he came in on April 3d, although he did not know the amount of the reduction. The cashier knew nothing of the matter and left his cage for several minutes. When he returned he paid the money from the till. It is significant that the written authorization which was signed by the appellant, which will hereafter be referred to, was signed by him on the same day. One of the appellant's deputies, who had charge of such complaints as this, testified that they had instructions from the appellant that before money could be paid back to taxpayers an investigation must be made and the data furnished the appellant and his personal "O. K." received, and that this procedure was followed invariably during the year 1934. The cashier testified that he had general instructions from the appellant that money might be given back to taxpayers but only upon the appellant's approval. He further testified that on many occasions the appellant had approved forms so that he might take cash out of the till and give the money to taxpayers, and that he did not make this refund without getting permission, and that he had never made a refund to any taxpayer without getting permission. Evidence was introduced of a number of occasions in which refunds had been made to taxpayers on the approval of the appellant without the formality of going through the board of supervisors. The appellant admitted on the stand that in a number of cases he had authorized the making of refunds to taxpayers by taking money from the till. Other evidence and other possible inferences, to which our attention is called, merely present a matter of conflict in the evidence.

The investigation report in this particular matter was introduced in evidence, which was a form regularly used for that purpose. This set forth the basis of the complaint and was handed to an investigator, one of the appellant's deputies. On March 7, 1934, this deputy entered his report on the form recommending a reduction of $6,000 in the amount of the

assessed valuation of the property. Another deputy, in charge of such matters, endorsed on the form a request for permission to make a refund of $356.40 on account of this over-assessment. Another deputy made a record of this, giving the refund a number, and endorsing the number on the form, and attached what is known as "Refund Form No. 232" to the investigation report by pinning the two together. These two were handed to the appellant who, on April 3, 1934, wrote on the investigation report, in a space reserved for him, the following: "O. K. Not necessary to go thru B of S. JHJ." and stamped the same "April 3, 1934". The appellant testified that he meant by the words "not necessary to go thru B of S" that it was not necessary to have this assessment equalized, that he had the right and the duty to change the assessment without the necessity of going before the board of supervisors for equalization, and that he intended to have the refund made in accordance with refund form No. 232. It does not appear what became of the refund form No. 232 which had been attached to the investigation report, but it does appear that the same was not used. This refund form No. 232 was a mimeographed form of a letter to a taxpayer, telling him that the records of the assessor's office show that he had apparently overpaid his taxes or that they had been paid more than once, and telling him to take his receipted bills and this letter to the county auditor "so that he may assist you in obtaining a refund from the board of supervisors, if you are entitled to it, and so that you may sign a claim therefor".

This investigation report, with the recommendation for a refund appearing thereon and with the approval by the appellant with the notation "Not necessary to go thru B of S", was, in itself, sufficient to justify the trial court's finding that the appellant had authorized the making of this refund to the taxpayer without the usual application to the board of supervisors. While the appellant says he meant that it was not necessary to have the matter referred to the board of supervisors as a board of equalization, a procedure provided for by the other sections of the Political Code, and that he merely intended to authorize the procedure indicated by refund form No. 232, the last mentioned form, which was attached to the investigation report, plainly showed on its face that it was to be used only in connection with making an application to the

board of supervisors. With that before him the appellant's written statement that this particular transaction need not go through the board of supervisors would indicate that he did not intend form No. 232 to be used or the procedure indicated by it to be followed.

While the appellant calls attention to other inferences that might be drawn, his written statement on the investigation report taken in connection with the other evidence is entirely sufficient to support the implied finding that the appellant authorized the making of this refund in the manner in which it was made.

■ It is further contended that the evidence is not sufficient to establish, on the part of the appellant, an intent to do wrong and that the statute placed this burden on the prosecution. It is argued that nothing here appears but a mistake in the manner of bookkeeping, with no loss to the county and no gain to the appellant; that no fraud on the part of the appellant appears; and that it was the intention of the legislature, in adopting the statute upon which this prosecution is based, to cover cases of actual misappropriation of public funds, but that the same was never intended to apply to such a harmless transaction as the one here in question. It is argued that since the legislature used the word "willfully" in subdivision 6 of section 424 of the Penal Code, it was necessary to prove that the appellant not only omitted to transfer the funds in question but that he did this with an evil intent to defraud the county or to gain something for himself. He relies on *People* v. *Swiggy,* 69 Cal. App. 574 [232 Pac. 174], *People* v. *Okomoto,* 26 Cal. App. 568 [147 Pac. 598], and *People* v. *Von Tiedeman,* 120 Cal. 128 [52 Pac. 155, 158]. He also cites certain cases from federal courts, including *Roberts* v. *United States,* 126 Fed. 897, where it is said that the word "wilfully" "as ordinarily used in the penal statutes, implied wicked purpose or perverse disposition, or, indeed, any evil or improper motive, intent, or feeling, or, to characterize an act done wantonly, . . . " Even in that case the part just quoted is followed by "or one which a man of reasonable knowledge must know to be contrary to his duty." In *People* v. *Von Tiedeman, supra,* the court said: "The word 'wilfully' implies 'a purpose or willingness to commit the act.' (Pen. Code, sec. 7) 'To do a thing willfully is to do it by design, with set purpose' (*People* v. *Shel-*

*don,* 68 Cal. 434 [9 Pac. 457]).'' In *People* v. *Okomoto, supra,* it is said:

''The statement in the Penal Code, section 7, subdivision 1, that the word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, includes, rather than excludes, the idea that the person doing the act was fully conscious of, or in other words, that he knew, what he was doing and all of the circumstances connected therewith which made the doing willful. The word 'willfully' alone, as thus used, does not imply an intent to violate law or to injure another; but when the word is used, as in this information, in connection with a specific statement showing a purpose to injure another, it implies a criminal intent, if the law makes the doing of that act with that purpose a criminal act.''

In *People* v. *Swiggy, supra,* the court said:

''The word 'willfully', as used in section 270, means a deliberate intention or a set purpose to omit to perform the natural duty which the section declares that an omission to perform shall be penalized. The word, when used in criminal statutes, has been said to be a stronger word than the word 'intentionally' in so far as the word may expose the intention or purpose in the mind of the defendant, and that 'it means governed by the will; obstinate; perverse'.''

We are unable to read these cases as sustaining the interpretation which the appellant gives the statute in question, namely, that it is necessary in a case of this kind to prove that the omission occurred with a wrongful intent on the part of the appellant to defraud the county. It is argued that the word ''willfully'' in this statute has no meaning unless given this interpretation. But section 7 of the Penal Code provides that this word when applied to the intent with which an act is done or omitted shall imply simply a purpose or willingness to commit the act or make the omission, and that it does not require any intent to violate law, injure another, or acquire any advantage. Even though it implies a criminal intent when used in connection with other words showing a purpose to injure another, no such words appear here. In this particular statute there is an obvious reason why the legislature intended that the wilful failure to turn over public funds should constitute an offense, regardless of what motives actuated the officer in so doing. To fail to turn over

such funds when required by law is made a wrong by the statute. To intentionally disobey the statute is to wilfully do this wrong. To so interpret it is not to render the statute meaningless. For example, if a check representing public funds fell behind a cash drawer when it was opened and was temporarily overlooked the failure of the officer to deposit the funds might not be a wilful one. Many other circumstances might be imagined where the mere failure to deposit the funds would not be a crime within the meaning of the statute because the word ''wilfully'' is included therein. Doubtless the legislature had such things in mind and inserted this word to cover any such a case.

But it does not follow that it was intended thereby to make it necessary to prove that a failure to transmit funds, when required by law, was done with the intent of defrauding the people or of embezzling the money. The matter of embezzling such funds is covered by other subdivisions of this section. From the very nature of the case it is necessary to surround the handling of such public funds with the greatest restrictions and safeguards. This is done by this statute and it is made a crime to wilfully omit to transfer such funds in accordance with the requirements of law. The charter of San Diego County required such funds to be transmitted to the county treasurer daily. In our opinion, this statute covers a case where an assessor intentionally and knowingly disobeys the law and it is not necessary to prove that in thus disregarding the law he also intended to defraud the public or to acquire financial gain for himself. To say the least, it is sufficient under that statute if the act is knowingly done in violation of the law and this sufficiently appears here. Knowledge and purpose to do wrong may appear from an intentional disregard of this statute as well as from an actual embezzlement or stealing of funds. ■ It fully appears that the appellant was aware of the law, that he complied with it in many cases, that he failed to comply with it in other cases, and that he intended here to keep these funds which should have been transferred to the treasurer for the purpose of paying someone who he thought had a just claim against the county. He had no more authority to use tax money which he had collected for this purpose, than he would have had to use the same to pay any other bill or demand which he might personally think was justly owed by the

county. It was entirely unnecessary to prove that his purpose was evil. The act itself was wrongful, in view of the statute, and it was sufficient to show that it was done wilfully and not merely inadvertently and unintentionally. In *People* v. *O'Brien*, 96 Cal. 171 [31 Pac. 45, 47], the court said:

"It is a familiar rule, that to constitute crime there must be a union of act and intent; but our code provides that 'the word "wilfully", when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage."

It is argued that he acted in good faith and "under color of the authority of law". Assuming that color of authority of law might in some cases excuse the omission to transfer such funds nothing here appears which might bring the appellant within any such rule. There can be no question, under the evidence, that the appellant's act in failing to deposit this money and in using it for another purpose was wilfully done, within the meaning of this statute.

Some contention is made by the appellant that the funds here in question were not public funds which the law required him to transmit to the county treasurer. In effect the argument is that the receiver for the theatre was entitled to the money returned and, therefore, the money was his and did not belong to the county. However, the appellant is not charged with the failure to transmit the money which was paid in by this taxpayer. That money had already been deposited with the county treasurer. The money used in making this refund was money which was subsequently paid in by other taxpayers in payment of taxes assessed upon their personal property. These funds belonged to the county and beyond question were public funds which the appellant was required by law to transfer to the treasurer.

It is further argued that the court erred in excluding from evidence a letter written to the appellant by the district attorney in June, 1931. This letter advised the appellant that he had a right to make any changes he deemed advisable on his assessment roll up to the time the rolls were turned over by him to the board of supervisors as a board of equalization. If it be assumed that the appellant, as assessor, was authorized to make such corrections as this in the assessment

rolls while they were still in his office it would by no means follow that he would have the right to use the money paid in by other taxpayers in making a refund to one whose assessment had been thus corrected without letting the money and the matter of the refund go through the proper channels provided by law. We find no error in the ruling complained of.

The appellant complains of the harshness of this statute if so interpreted as to permit a conviction for its violation where no overt dishonesty or intent to defraud has been shown. In *People* v. *Dillon,* 199 Cal. 1, the court said: ''The wisdom of the legislature in requiring custodians of public moneys to hold them inviolate is both a protection to the public and to the officer as it tends to remove from him the temptations that beset those who have large sums of money in their possession free from immediate demands.'' And further:

''The safekeeping of public moneys has, from the first, been safeguarded and hedged in by legislation most strict and severe in its exactitudes. It has continuously been the policy of the law that the custodians of public moneys or funds should hold and keep them inviolate and use or disburse them only in strict compliance with the law.''

Apparently, ample provision has been made in the law for the making of refunds to which a taxpayer is legally entitled. The decision in such matters has been placed with the board of supervisors and not with the assessor. To permit the various officers of the county to make such disposition of county funds in their hands as they desire would open the door to such possibilities of fraud as to fully justify laws which may seem harsh in an individual case.

The appeal from the judgment is dismissed and the order denying a new trial is affirmed.

Marks, J., and Jennings, J., concurred.