[Crim. No. 4709.   In Bank.   Feb. 18, 1947.]

In re WILLIAM MARVIN LINDLEY on Habeas Corpus and for Writ of Error Coram Vobis.

Jesse W. Curtis, Sr., Al Matthews, Arthur D. Carr and Rosalie S. Asher for Appellant.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, and Loyd E. Hewitt, District Attorney (Sutter County), for Respondent.

EDMONDS, J.—William Marvin [Marven] Lindley was found guilty of the murder of Jackie Hamilton, a 13-year-old girl. The verdict included no recommendation for life imprisonment and a sentence of death followed. Upon appeal, the judgment and the order denying a new trial were affirmed. (*People* v. *Lindley*, 26 Cal.2d 780 [161 P.2d 227].) Thereafter the superior court denied a writ of error *coram nobis*. In the present proceeding, the petition for a writ of habeas corpus includes an application "by way of appeal" from that order and also asks that this court grant a writ of error *coram vobis*.

The petition asserts generally that the judgment of conviction is "illegal" because of certain false testimony given by several witnesses at the trial. This evidence, the petition alleges, was offered by the State with knowledge of its falsity. More specifically, it is charged that a representative of the State suppressed, or prevented the introduction of, evidence which would have been favorable to Lindley's defense.

In the petition, extrajudicial statements said to have been made by Louis Onie Hamilton, father of the victim, are compared with his testimony at the trial, and it is alleged that the witness, because of deliberate "fraud, or perjury, . . . or because of persuasive influence, amounting to duress, of Sheriff A. W. Kimmerer . . . or because of faulty memory and plain mistake . . . ," changed his testimony to such an extent

that the jury, courts, and Lindley's attorney "were misled into believing that Lindley was the only person in the vicinity of the crime at the time it took place who could have been 'the man in the willows.'" The testimony of Willa Mae Hamilton, Jackie's sister, is attacked upon the ground that, as a result of her false testimony, the jury and court and Lindley's attorney "were misled into believing that she had never met Lindley and for that reason did not recognize him as the man she had seen in the willows." In support of this allegation, an affidavit of Nathan W. Owen is attached to the petition.

A further charge is that Jackie described her assailant as "an old red-headed man," and although she knew Lindley and called him "Red" she did not use that name in any statement in regard to her injury. The evidence upon which the conviction rests is also criticized in other particulars.

Sheriff Kimmerer, according to the petition, in a published statement asserted that Luther B. Owen, the 11-year son of Nathan W. Owen, was not near the scene of the crime, but as a matter of fact, he was in the immediate vicinity when it was committed. In an affidavit made by Ferrel Fry and attached to the petition, she declares that the boy told her he was present at the boat house about the time of the crime and saw a red-headed fisherman in the willows "waving a fishing pole at the girls in swimming." Also, the affidavit continues, "the Owens boy definitely stated that he saw . . . Jackie grabbed by a man who had been standing in the willows and that it was a man other than Marvin Lindley, that he thinks it was the other red-headed man who had been fishing."

Another affidavit, included in the petition, was made by Betty Biggs Schrick, a newspaper writer. She states that in an interview with Guino Filipelli, a shepherd boy who testified as an eyewitness to the tragedy, he told her "that the two boys on horseback went to the boat house before he saw the man grab Jackie" and after the attack "he saw the man walk toward the boat house but he did not see the man enter the boat house."

A report made by the acting governor in connection with a reprieve granted Lindley is made a part of the petition. This report includes the statement that, since the trial, new and additional evidence has been discovered by reporters who interviewed the father and sisters of the victim. As summarized in the report, this evidence relates to the presence of a

red-headed fisherman who followed Jackie toward the camp and was "ogling the [Hamilton] girls who were in swimming."

The remaining allegations of the petition relate to the asserted knowledge of the prosecuting officials in regard to the false testimony, their neglect in failing to conduct a full investigation, and the mental condition of Lindley. In this connection it is alleged that the prosecuting officials "deliberately suppressed information they had obtained from Willa Mae Hamilton" concerning the description of a red-haired fisherman who was watching the girls in swimming, "for the reason that such information would have been fatal to their theory of Lindley's guilt, and would have raised a reasonable doubt in the minds of the jurors." Other charges are that "the misinformation given the investigators from the Department of Justice from the State of California by Sheriff Kimmerer led them to neglect to interview any of the Hamilton family and the two fishermen Logan and Davis," who, according to their own admission, were not over two hundred feet from the place of the attack. Also, the petitioner declares, no effort was made to communicate with Luther B. Owen or Henry (Shorty) Sternat, who were present at the boat house at the time the crime was discovered. The pleading concludes with a statement of asserted facts tending to prove Lindley's insanity at the time the crime was committed, during the trial and at the present time.

Upon this petition, a writ of habeas corpus issued, and Honorable Donald Geary, Judge of the Superior Court, in and for the County of Sonoma, was appointed referee to hear the evidence responsive to the following questions:

"1. Did any witness who testified against William Marven Lindley in the trial which resulted in the judgment of conviction, affirmed by this Court in *People* v. *Lindley*, 26 A.C. 714, [26 Cal.2d 780 (161 P.2d 227)], commit perjury as defined in the Penal Code of the State of California; that is, did any witness testify to any material matter which he knew to be false?

"2. In the event that any witness did commit perjury, did any representative of the State of California cause or suffer such testimony to be introduced, knowing such testimony as given was perjured?

"3. Did any representative of the State of California suppress or prevent the introduction of any evidence which, had it been given, would have been favorable to the defense of William Marven Lindley?"

The referee visited the scene of the crime and held hearings in five cities of the state. More than 40 witnesses appeared and testified. The identification of Lindley and his conviction, the referee reported, "rested primarily upon the testimony of four witnesses: Louis Onie Hamilton, father of Jackie Marie, the victim; Barbara and Willa Mae Hamilton, her sisters, and Guino Filipelli, herding his sheep across the river some six hundred to seven hundred feet away. Two of these witnesses, Mr. Hamilton and his daughter Barbara, testified that Jackie Marie Hamilton had directly accused . . . [Lindley] in the words 'the old red-headed man at the boat house did it.' Three of them, Mr. Hamilton and his daughters Barbara and Willa Mae, also testified to conduct of . . . [Lindley] that must plainly have indicated to the jury, and anyone reading the trial transcript, evidence of a deep consciousness of guilt on his part." Because of the importance of the testimony of these witnesses and the attacks made upon it in the present proceeding, the referee included in his report extensive quotations from the records of the coroner's inquest, the grand jury inquiry, the trial of Lindley, and the transcript of the recent hearings. To summarize this evidence within reasonable limits presents many difficulties.

At the trial, Louis Onie Hamilton testified upon direct examination that when he first arrived at the side of his injured daughter she said, "Daddy, that old red headed man, the dirty liar." She repeated this several times, he declared. He also quoted her as saying, "Daddy, that old red headed man; that dirty liar at the boat house." Upon cross-examination, Hamilton's testimony before the grand jury, in which no reference to the boat house appears, was read to him. In explanation of that testimony, Hamilton replied, "I answered the question in this way. She said, 'the old red headed man, the dirty liar at the boat house, did it.' " The father's recital before the coroner's jury of his daughter's statements was the same as that given at the trial.

At the referee's hearing Hamilton testified that in answer to his inquiry Jackie said: "The old red-headed man, the dirty liar, did it." And after Barbara suggested that Jackie be taken to the boat house, the father told the referee, the

injured girl said, "No, no, that old red-headed man at the boat house, the dirty liar, did it."

At the trial Hamilton was asked if he had seen "any other red headed men around there, except Lindley," and he replied, "No, sir." He did not see Lindley after Lindley left the camp following their return from the nearby ranch on an errand, Hamilton testified, and Lindley did not come up from the boat house while Jackie was in the car. According to Hamilton, he saw Lindley give some water to his daughter, Barbara, "on the platform of the boat house"; then Lindley "turned his head went on back. Dropped his head and went back to the boat house." The witness repeated some of this testimony before the referee, but stated that about the time the crime was committed, he saw a fisherman, dressed in khaki and wearing a blue straw hat, picking a fig. He did not notice the color of the man's hair or his complexion. When he was before the grand jury Hamilton said that when Jackie came up to the camp he saw Lindley go "down through the woods there."

Barbara Hamilton told the grand jury, "I said, 'Daddy, let's take her to the boat house' and she said 'No, daddy, no. That old red headed man is a dirty liar.'" At the trial, under cross-examination, Barbara gave Jackie's answer as, "No, daddy, the old red headed man at the boat house did it, the dirty liar." When shown her testimony before the grand jury, she stated it was true. Before the referee upon direct examination, quoting her sister, Barbara used the same language as she did at the trial. But when asked if it was possible that her sister did not mention the boat house, but said only, "No, daddy, that old red-headed man, that dirty liar," she replied, "It could be." Under cross-examination she said that she was not able to remember whether Jackie said anything about the red-headed man being at the boat house. In regard to her testimony generally, Barbara stated to the referee that no one in the sheriff's office or in the district attorney's office had told her what to say.

Barbara testified both before the grand jury and at the trial that she did not see Lindley come up from the boat house to the car where Jackie had been placed; Lindley came only half way. She asked either Lindley or Henry Sternat to get some water for Jackie. Lindley "walked as slow as he could." At the hearing before the referee she could not remember testifying to some of these facts, and in answering the ques-

tion, ". . . you didn't tell him [Red] to get Bill, and he didn't walk as slow as he could? None of those things happened, did they?", she replied, "No." When asked, "In other words, you say, Barbara, that is a wrong statement," she at first said, "Yes"; but then stated, "Yes . . . I don't recall that . . . I wouldn't say they are wrong." In corroboration of the testimony of Barbara and her father, Richard Burks and Lawrence McCarthy, horseback riders, told the jury at the trial of Lindley that he did not come up to the car during the time Jackie was there.

Kenneth Hopper, deputy sheriff, and E. L. McCune, constable, who were present when Louis Onie Hamilton brought Jackie to the police station before taking her to the hospital, testified before the referee that Jackie's statements were limited to "The old red-headed man did it, Daddy, the old red-headed man." Jackie said nothing while they were present which connected the red-headed man with the boat house, they testified. However, in corroboration of the testimony of Jackie's father and sister is the statement found in a special agent's report as follows: ". . . Sheriff Kimmerer states the answer that he had from the girls from the very start was, 'It was the old red headed man at the boat house, he did it, the dirty liar.'"

Willa Mae Hamilton, also a daughter of Louis Onie Hamilton, testified upon the trial that she "just glanced" at the man in the willows, but did not recognize him. However, this witness testified before the referee, "Yesterday [April 1st, 1946] when I got to studying it over, it was Lindley" who was the man in the willows. In conflict with Willa Mae's testimony at the trial that she had never been down to the boat house before the day Jackie was killed is the affidavit of Nathan William Owen in which he states that Willa Mae had met Lindley at the boat house on several occasions prior to the time of the attack. This witness did not appear before the referee. Upon the trial, Willa Mae testified that after they took Jackie away she did not go to the place where Jackie was found. But, upon being questioned at the referee's hearing, she said that she accompanied Lindley, who was carrying her younger sister, Shirley, to the willows where the attack occurred.

Unquestionably the jury which convicted Lindley believed the account of the crime which was given by Guino Filipelli, a shepherd boy. He was herding sheep across the Feather

River when the attack occurred and testified as an eyewitness to the homicide. He said that while sitting under a tree, he had watched two girls swimming. They left the water and entered the boat house. Later he noticed one of the girls go toward her home. Then he saw a girl come down to the water and wash her feet. When she went back toward the levee, he said, she started fighting with "Red" and they went down behind the willows. He positively identified "Red" as one of two men he had seen around the boat house and said that on the afternoon Jackie died he saw "Red" walking back and forth in the willows, wearing a brown hat, brown pants, and brown shirt. The record of the trial shows that he picked "Red" out in the jail, and recognized Lindley in the courtroom as "Red," even against suggestions of other identity.

Guino's mentality and his ability to correctly recognize colors were severely challenged at the referee's hearing. He told the referee that he did not know what an oath was. In response to the question, "Do you know what it is to tell the truth?" he replied, "Yes. . . . Don't tell no lies." However, he did not know what "it is to tell a lie," and when asked "In other words, as you see it, telling a lie, telling the truth is the same thing, is that right?", he replied, "Yes." When asked, "Why do you tell things because somebody else tells you to tell them?", Guino replied, "Because he wants to tell them."

When asked to state the color of the dress of a woman who was attending the referee's hearing, he said "black"; in reality it was brown and white. In answer to the question, "Why did you first believe you had on brown pants?", the witness replied, "Because I like brown." In view of this testimony, the referee conducted experiments along the banks of the Feather River. Cards measuring about two by three feet were shown to Guino at different times and he was questioned as to their color. The distance from the witness to these cards was stipulated as being between six and seven hundred feet. He said that the yellow card was white, a gold one brown, an orange one red, and a gray one blue. At another time, he said that green was blue, gold was white, light brown was white, and pink was red, but he identified some colors. He correctly stated at one time that a man across the river and at the same distance from him was wearing a brown hat, coat, and trousers. But he erroneously identified a blue hat as brown,

a grey coat as black, and a brown hat and trousers as black.

In his examination before the referee as to his testimony at the trial, Guino's answers were quite inconsistent. However, when he was allowed to tell his story as a whole without the pressure of questions by counsel, he gave it in essentially the same form as at the trial.

Kenneth Hopper, deputy sheriff assigned to investigate the crime, testified before the referee as to an interview with Guino the next day after the crime was committed. Later, he said, Sheriff Kimmerer questioned the boy. Each time Guino told practically the same story. According to Hopper, they allowed Guino to tell his own story freely and asked him only necessary questions. As he recalled the conversation at that time, "The Sheriff asked [Guino] if he knew the man and he said yes, it was Red from the boat house." Sheriff Kimmerer died some time before the referee's hearings.

In the course of the investigation, Guino was taken to the scene of the crime by Hopper. In his testimony before the referee, Hopper said that at the time he talked with Guino he was satisfied as to the competency of the boy. Both Hopper and Guino's father told the referee that Guino picked out Lindley from a group of four or five prisoners as the man in the willows. He also selected Lindley's brown hat from several exhibited to him as the one worn by Jackie's assailant. Hopper's testimony was corroborated by Guino's mother and father who told the referee that on the evening of the crime Guino related the events to them in substantially the same language as he used in answering the questioning of the officers and at the trial.

The testimony of Luther B. Owen, presented to the referee by deposition, is not in accordance with the facts stated in the affidavit of Ferrel Fry. Although Luther admitted that he was in the vicinity of the boat house on the date in question, he denied seeing a fisherman or red-headed man in the willows. Moreover, he specifically contradicted the statements of Mrs. Fry regarding her asserted conversation with him. However, Mrs. Fry insisted before the referee that Luther told her the story which she related in her affidavit.

Several witnesses told the referee that at the time of the homicide a red-headed hop picker was employed at the Cunningham ranch, located about a mile and one-half from the boat house. On the day Jackie died this man did not work and was drinking heavily. That evening, they said, a fight

occurred at the hop ranch and in the melee two fellow workers accused the red-headed man of "having done it." According to a witness to the fracas, one of the hop pickers said to the red-headed man, "If I tell on you, it will be the ropes for you." The red-headed man then "jumped like a tiger" and choked the accuser. Sheriff Kimmerer was notified of this incident and the following afternoon went to the hop fields and interviewed witnesses. However, by that time, the men who were in the fight had left without collecting their wages which, for one of them, amounted to about $24.

Late in the afternoon of the day of the homicide, according to testimony presented to the referee, a red-headed man appeared at the Gum Tree Store, located in the vicinity of the Cunningham ranch. He purchased some clorox and soap. A clerk in the store noticed that the man's face was scratched and "he was so nervous he couldn't accept his change." The man told the clerk to "mind . . . [her] business," when she questioned him about his nervousness. This incident was reported to a highway patrol officer and the man was identified. But, according to the officer, the man "didn't look like his description." The witness did not know whether the officer talked with the man. Later, the proprietor of the store reported her suspicions to the sheriff but, as she related the incident, neither the sheriff nor any of his deputies interviewed her. However, she did not know what, if any, investigation the sheriff had made. Several other witnesses testified that a red-headed man other than Lindley was in the vicinity at the time of the homicide.

Upon reviewing all of the evidence, the referee concluded that the testimony of Louis Onie Hamilton, Barbara Hamilton, and Willa Mae Hamilton, as given at the trial of Lindley, was erroneous and untrue in certain particulars. This testimony was material, in the opinion of the referee, and its effect cannot be minimized. However, he found that it did not constitute perjury as that term is defined in the Penal Code of California. In explanation of his finding he reported: "The character, personality, emotional reaction and intelligence of each of the witnesses is clearly revealed by their testimony at the various hearings and their appearance upon the stand. The nature of the crime and the excitement, in the case of one witness described as hysteria, immediately following its discovery, undoubtedly affected the ability of the witnesses to

either accurately observe or correctly relate all facts as they were. More than a year elapsed between the date of the crime and Lindley's trial. Admittedly, the Hamilton family had occasion to frequently discuss their tragedy and the circumstances connected therewith. It would be surprising if a natural and abiding resentment against the person designated by the authorities as the perpetrator of the crime did not exercise an important, though unconscious, influence in such discussions. Indeed, the continued presence of such resentment is manifest in the testimony of these witnesses herein. Under such circumstances, in view of those common vagaries which affect each of us at times, the ability to distinguish between fact and fancy must necessarily have been reduced to the vanishing point. Hence, although in the heretofore mentioned particulars the Referee is convinced the testimony of the witnesses . . . was not in accord with the facts, unquestionably these witnesses testified according to their belief and conviction. . . ."

Considering the story of the crime which the young shepherd boy related to the jury, the referee found "his testimony in certain essential details, eventually and after much conflict, reverts to substantially the same as originally related by him. It is quite probable that, in part at least, his testimony is based upon a combination of observation and a lively imagination. . . . However, it cannot be doubted that regardless of the quality of his testimony the witness testified in each instance according to his own belief and conviction, such as they are. Under such circumstances his testimony cannot legally be deemed perjured. . . ."

The finding upon the second issue submitted to the referee is that no perjury or false testimony was knowingly introduced against Lindley by any representative of the State of California. In the opinion of the referee, the only witness whose testimony affords the slightest support of the charge that perjury was committed by any person, or that the record in the trial of Lindley includes either perjured or false evidence, is that of the shepherd boy. As to him, the referee reported:

"The inherent weakness is in Filipelli's testimony and the existence of at least an opportunity for the sheriff and his deputies, were they so disposed, to have induced or permitted the witness to commit perjury or offer false testimony

must be conceded. However, there is not a scintilla of evidence herein indicating such a disposition upon the part of Sheriff Kimmerer, Deputy Hopper or any other representative of the State of California.

"The conclusion necessarily follows that Guino Filipelli testified according to his belief and conviction, of doubtful value though they be. Yet he committed no perjury. Under such circumstances, there is no foundation for the claim of subornation of perjury or that anyone caused perjured testimony to be introduced knowing the same to be perjured. . . . Nor can it be held that any representative of the State of California knowingly suffered false testimony—as distinguished from perjured testimony to be introduced, knowing the same to be false. The witness Filipelli was questioned and requestioned. From such questioning the Sheriff gained some doubt of the reliability and truthfulness of the witness. The parents were questioned and declared the boy to be truthful. He was thereafter always questioned in the presence of his father. The father was present when he identified . . . [Lindley] and the latter's hat. The Sheriff appears to have placed the boy in the position from which he claimed to have seen the crime committed and, according to Mr. Hewitt, 'they could recognize color and movements' from that point. . . . That, of course, is not equivalent to stating the witness could recognize 'color and movements' but it certainly reveals an effort to ascertain the credibility of the witness. The evidence shows the law enforcement officers acted with reasonable caution as regards the witness. The legal qualification of the witness was a question that was neither addressed to, nor determinable by them in the first or final instance. . . ."

In regard to the charge of the suppression of evidence by officers of the State, the referee reviewed the testimony in regard to the man known as "Red" who worked on the Cunningham ranch and talked to the proprietor of the Gum Tree Store. The report also mentions the testimony of fourteen witnesses tending to prove that an unidentified red-headed man was in the vicinity of the Hamilton camp at the time of the attack upon Jackie. "Such testimony," the referee concluded, "might possibly indicate that the Sheriff and his deputies did not thoroughly exhaust all of the reasonable clues available to them as to the perpetrator of the crime. If such were in fact the case, such conduct would certainly indicate inefficiency. However, assuming that one whose duty it was

so to do did not properly investigate a case, and did not explore clues as he should have done, if, even though by reason of his failure to look for evidence he discovered none, he could not be charged with suppressing it. One cannot suppress that which he does not possess. The testimony offered upon this issue falls far short of establishing the suppression of evidence or the prevention of the introduction of any evidence by the Sheriff or any other law enforcement officer which, if given, would have been favorable to the Petitioner. . . .''

Upon the filing of the referee's report and findings, the cause was calendared for oral argument before this court. At the time of hearing, although the referee determined each issue submitted to him in favor of the State, the attorney general moved for, and was granted, leave to file an answer and objections to the referee's determinations. The document subsequently presented challenges the conclusion of the referee as to the falsity of some of the evidence upon which Lindley was convicted. The reply filed by counsel for Lindley declares that its purpose is ''to vindicate the general Findings of the Referee.'' In the main, Lindley's attorneys now urge that he was convicted by the testimony of witnesses known by the prosecution to be incompetent, that new and material evidence has been discovered that was not presented at Lindley's trial, that certain testimony was false, that Lindley was insane when the crime was committed and at the time of trial, and is now mentally incompetent.

In a habeas corpus proceeding, one who establishes by a preponderance of substantial, credible evidence that he was convicted by perjured testimony knowingly presented by representatives of the State, is entitled to a judgment discharging him from custody and the suppression by the State of material evidence will be considered in connection with such a charge. (*Mooney* v. *Holohan,* 294 U.S. 103, 112 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406] ; *In re Mooney,* 10 Cal.2d 1, 14 [73 P.2d 554].) However, evidence which is uncertain, questionable or directly in conflict with other testimony does not afford a ground for relief upon habeas corpus, and the proceeding may not be used as a device for the correction of mere errors or irregularities committed within the exercise of an admitted jurisdiction. (*In re Porterfield,* 28 Cal.2d 91, 99 [168 P.2d 706] ; *In re Connor,* 16 Cal.2d 701 [108 P.2d 10].)

■ ■ Upon habeas corpus, ordinarily it is not competent to retry issues of fact or the merits of a defense, such as insanity, and the sufficiency of the evidence to warrant the conviction of the petitioner is not a proper issue for consideration. (*In re Connor, supra; In re Drew,* 188 Cal. 717 [207 P. 249]; *In re Stevenson,* 187 Cal. 773 [204 P. 216]; *In re Williams,* 183 Cal. 11 [190 P. 163]; *In re Jacobs,* 175 Cal. 661 [166 P. 801]; *Ex parte Long,* 114 Cal. 159 [45 P. 1057; *Ex parte Cottrell,* 59 Cal. 420; *Ex parte Bird,* 19 Cal. 130; *In re Vitalie,* 117 Cal.App. 553 [4 P.2d 171]; see *In re Nicholson,* 24 Cal.App.2d 15 [74 P.2d 288]; 13 Cal.Jur. 238; 39 C.J.S. 469, et seq.) ■ Nor is habeas corpus an available remedy to review the rulings of the trial court with respect to the admission or exclusion of evidence, or to correct other errors of procedure occurring on the trial. (*In re Polizzotto,* 188 Cal. 410 [205 P. 676]; *Burall* v. *Johnson,* 134 F.2d 614; *Thouvenell* v. *Zerbst,* 83 F.2d 1003; see 25 Am.Jur., Habeas Corpus, § 28; 39 C.J.S., Habeas Corpus, § 21.) ■ Also, newly discovered evidence does not justify relief unless it is of such character as will completely undermine the entire structure of the case upon which the prosecution was based. (*Kelly* v. *Ragen,* 129 F.2d 811; see 39 C.J.S. 503.)

■ In the present case, considering as a whole the great mass of evidence presented at the coroner's inquest, before the grand jury, at the trial of Lindley and during the hearings held by the referee, serious conflicts and unexplainable discrepancies clearly appear. It may also be said that there is substantial support for the referee's conclusion that certain testimony given by members of the Hamilton family was untrue. But it is equally clear that the evidence falls far short of showing that perjury, as defined in section 118 of the Penal Code, was committed by any witness who testified before the jury which convicted Lindley of murder. "Perjury cannot be willful where the oath is according to the belief and conviction of the witness as to its truth; reckless disregard of truth by a witness who has no belief that he is swearing falsely is not perjury, though his testimony is in fact false, and he would have made it true if he had used caution." (*People* v. *Von Tiedeman,* 120 Cal. 128, 137 [52 P. 155]; see *People* v. *Wong Fook Sam,* 146 Cal. 114, 115 [79 P. 848]; *People* v. *Nelson,* 36 Cal.App.2d 515, 519 [97 P.2d 1043]; *People* v. *Johnson,* 14 Cal.App.2d 373, 379 [58 P.2d 211].) And there

is no evidence whatever in the record that any false, as distinguished from perjured, testimony was knowingly caused or suffered to be introduced at the trial of Lindley by any representative of the State. Some of the conflicts and inconsistencies in the statements of the witnesses connecting Lindley with the crime can be reconciled. However, all of these discrepancies and any probable falsehoods relate to issues of fact or matters of defense, and were, or could have been, brought to the attention of the jury. All of them came within the scope of the appeal from the judgment.

The evidence in the present proceeding concerning the shoes which were found near the scene of the crime and the footprints in the vicinity, coupled with the testimony in regard to another person, or persons, who generally met Jackie's description of her assailant, afford some basis for a conjecture that the sheriff or his deputies did not exhaust all of the possible clues. But the record does not show that all available and important clues were not explored. And even assuming that the investigation was incomplete, as the referee concluded, the evidence falls far short of proof, by substantial credible evidence, that the representatives of the State suppressed or prevented the introduction of any evidence which would have been favorable to the defense of Lindley.

Although newly discovered evidence may justify relief by habeas corpus when it completely undermines the entire structure of the case presented by the prosecution at the time of the conviction, the testimony presented to the referee does not go that far and affords only a basis for speculation or conjecture. Proof that a red-headed man other than Lindley was in the vicinity of the boat house at the time the crime was committed, or the identification by a witness of this stranger as the "man in the willows" would have weakened the prosecution's case and presented a more difficult question for the trier of fact. But the testimony in regard to the other man does not point unerringly to Lindley's innocence.

Also, the conclusion of a former autopsy surgeon, called as an expert witness, that, in his opinion, Jackie died of a heart attack, presents only a conflict with the evidence which was before the jury.

The grounds upon which a court may issue a writ of error *coram nobis* or writ of error *coram vobis* are more narrowly

restricted than those which allow relief by habeas corpus. "In the original as well as in the modern practice [the purpose of these writs] . . . was not to permit a review of the evidence given in connection with the issues actually tried to determine whether witnesses who actually testified before a jury sworn on those issues testified falsely, but to determine whether facts existed which were not known to the court at the trial and not in issue under the pleadings, but which, if known, would have prevented the judgment which actually was entered from being entered. And that must necessarily have been so, for, if the effect of the writ was to permit the court in which the judgment was entered to decide whether the witnesses in the case had testified falsely, and if it decided that they had to reverse it, instead of being the end of the litigation, the judgment might well be but the beginning of it. . . . Where applicable at all, there is little dissent from the proposition that it lies to obtain relief from such errors of fact as the infancy, death, or coverture of the defendant in cases where those defenses, if known at the time, would have prevented a judgment but which through no fault of the defendant were not known when the judgment was entered. . . . Such facts would rarely affect the proceedings in a criminal prosecution; consequently the writ is less frequently available in such cases than in civil cases, and there is less uniformity in the decisions as to what errors of fact will justify its use in criminal prosecutions. But it has been generally held that, where the writ is available, it lies to reverse a judgment obtained by fraud, coercion, or duress, as where a plea of guilty was procured by force, violence, or intimidation, or where at the time of the trial the defendant was insane, when such facts were unknown to the court when the judgment was entered . . . or where the accused was prevented by fraud, force, or fear from presenting defensive facts which could have been used at his trial, when such facts were not known to the court when the judgment was entered. . . . By the decided weight of authority, however, the remedy is not broad enough to reach every case in which there has been an erroneous or unjust judgment on the sole ground that no other remedy exists, but it must be confined to cases in which the supposed error inheres in facts not actually in issue under the pleadings at the trial and were unknown to the court when the judgment was entered, but which, if

known, would have prevented the judgment. Accordingly, it is stated as a general rule that 'the writ of error *coram nobis* does not lie to correct an issue of fact which has been adjudicated, even though wrongly determined; nor for alleged false testimony at the trial; nor on the ground that a juror swore falsely as to his qualifications; nor for newly discovered evidence. . . .' " (*Keane* v. *State,* 164 Md. 685 [166 A. 410, 411, 412, 413]; see *People* v. *Mazurski,* 298 Ill. App. 362 [18 N.E.2d 701, 706]; *Hicks* v. *State,* 213 Ind. 277 [11 N.E.2d 171, 12 N.E.2d 501, 502]; *Coppock* v. *Reed,* 189 Iowa 581 [178 N.W. 382, 383; 10 A.L.R. 1407]; 24 C.J.S. 145, et seq.)

This restricted scope of the writ of *coram nobis* has been recognized by the California courts. As stated in *People* v. *Reid,* 195 Cal. 249, 256 [232 P. 457, 36 A.L.R. 1435] (quoting from *Sanders* v. *State,* 85 Ind. 318 [44 Am.Rep. 29]): " 'It is our opinion that the courts have the power to issue writs in the nature of the writ *coram nobis,* but that the writ cannot be so comprehensive as at common law, for remedies are given by our statute which did not exist at common law— the motion for a new trial and the right of appeal—and these very materially abridge the office and functions of the old writ. These afford an accused ample opportunity to present for review questions of fact, arising upon or prior to the trial, as well as questions of law; while at common law the writ of error allowed him to present to the appellate court only questions of law. Under our system all matters of fact reviewable by appeal, or upon motion, must be presented by motion for a new trial, and cannot be made the grounds of an application for the writ *coram nobis.* Within this rule must fall the defense of insanity as well as all other defenses existing at the time of the commission of the crime. Within this rule, too, must fall all cases of accident and surprise, of verdicts against evidence, of newly discovered evidence, and all like matters.' " (Quoted with approval in *People* v. *Lumbley,* 8 Cal.2d 752, 759 [68 P.2d 354]; *People* v. *Superior Court,* 4 Cal.2d 136, 149 [47 P.2d 724].) ▮ The basis for the issuance of a writ of error *coram vobis* is substantially the same as for a writ of error *coram nobis;* ▮ however, the application for a writ of error *coram nobis* should be addressed in the first instance to the court in which the petitioner was tried and convicted. (*In re De La Roi,* 28 Cal.2d 264, 276 [169 P.2d 363].)

It is conceded by all concerned that the shepherd boy was of dull mentality, as noted by this court in its opinion affirming the judgment. The court then observed: "At the trial he gave testimony which, along certain lines, such as that regarding the color of bathing suits, showed a tendency to give an affirmative answer to each question asked, although his replies were inconsistent." (*People* v. *Lindley, supra,* p. 786.) The testimony before the referee substantiated this observation. But Guino's competency was not challenged at the time of the trial, although his mental capacity and the inconsistencies in his testimony, to some extent, were brought to the attention of the jury by cross-examination and the argument of counsel.

The record of the testimony presented to the referee does not bear out the charge that Guino is an incompetent person. The evidence in this regard shows that he has an I. Q. of between 40 and 50. In terms of physical age, this is said to be the equivalent of the mental capacity of a normal child between six and eight years old. He completed the work of the eighth grade, but when asked if he had done so he replied "No." His reply to the question, "Can you read," was, "Not much." He did not know the name of the school he attended but said his teacher was Miss King. He acknowledged that while in school he had experienced difficulty in seeing and hearing.

This evidence does not, as a matter of law, show that either at the time of the trial or upon the date he was examined before the referee, Guino was an incompetent person. The record upon each occasion of his examination as a witness shows many inconsistencies in his answers. Very probably the boy was quite confused by his strange surroundings and the questioning of the attorneys. But as the referee reported, he has never changed his testimony in certain essential particulars.

The charge now leveled against Filipelli, in effect, is a repetition of the attack made upon his testimony when the judgment was under review. In challenging the evidence as being insufficient to support the judgment of conviction, Lindley's counsel then declared: "A perusal of the cross-examination of this witness will show conclusively that he can be made to answer any question satisfactory to the questioner as he did the question of the District Attorney set forth

above. It is impossible to give a better picture of the mentality of the witness than is given by his answers on direct and cross-examination. His testimony is full of discrepancies and is absolutely unreliable and unbelievable.''

Very probably, Sheriff Kimmerer and the other officers who interviewed Filipelli were fully aware of his limited education and mental deficiencies. But, necessarily, officers must interview and procure for the prosecuting officials as witnesses those persons who know the facts in regard to the crime which has been committed. The officers, and counsel, must use the available persons; the weight to be given to their testimony is a question for the court or jury. The evidence before the referee fully supports a determination that the representatives of the State acted with reasonable caution in interviewing Filipelli and presenting him as a witness, and, as the referee concluded, his competency as a witness ''was a question that was neither addressed to nor determinable by them in the first instance.'' Under these circumstances, there is no ground for relief by writ of error *coram nobis,* writ of error *coram vobis,* or habeas corpus.

The question of whether Lindley was insane at the time of his conviction was indirectly considered upon the appeal from the judgment, and no additional evidence which properly could have been presented during the trial was offered before the referee. The plea of not guilty by reason of insanity was not raised as a defense and this court is not now in a position to re-examine Lindley's sanity either at the date the crime was committed or at the time of trial. If, as alleged in the petition, Lindley now is insane, the applicable procedure is specified by sections 3701 et seq. of the Penal Code. The facts here relied upon present only a case for further investigation and consideration by the Governor of this State, if he be so advised. (Cal. Const., art. VII, § 1; *In re De La Roi,* 28 Cal.2d 264 [169 P.2d 363].)

The writ of error *coram vobis* is denied, the writ of habeas corpus heretofore issued is discharged and Lindley is remanded to custody.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

SCHAUER, J.—I concur only because upon the record, and remaining obedient to the established law of this state, no alternative judgment appears tenable. In the interests of

justice, however, I am impelled to declare that that same record leaves with me a grave doubt as to whether Lindley is guilty of the crime of which he stands convicted. The seeming anomaly in the foregoing statements arises from the fact that in this proceeding for a writ of habeas corpus and by way of error *coram vobis* the grounds upon which we may act are strictly limited. (For a statement of those limitations see *People* v. *Gilbert* (1944), 25 Cal.2d 422, 442 [154 P.2d 657] ; *In re De La Roi* (1946), 28 Cal.2d 264, 269 [169 P.2d 363].)

No serious contention is or can be made that the showing warrants the writ *coram vobis*. The bulk of petitioner's contention is directed to the application for the writ of habeas corpus and the only recognized ground (lack of due process of law) upon which that writ is sought depends on showing that the conviction was obtained upon perjured testimony produced by the prosecution *with knowledge of its falsity*. "Proof of both elements, perjury and knowledge, by a preponderance of credible evidence, is indispensable" to discharge of the convicted person on habeas corpus based on that theory. (*In re Mooney* (1937), 10 Cal.2d 1, 15 [73 P.2d 554] ; *In re De La Roi* (1946), *supra*, 28 Cal.2d 264, 269.) Thus a showing by a preponderance of evidence that the defendant had been convicted upon mistaken or false testimony and that he was in fact innocent would not justify sustaining the writ and releasing the convicted person because, in the absence of proof that perjured testimony had been introduced with knowledge of its falsity on the part of a responsible representative of the state, there would be no lack of due process. The remedy in such cases is committed by our law exclusively to the governor of the state.

The record in this proceeding discloses apparently substantial evidence, relevant to Lindley's guilt or innocence, which was not introduced at his trial. It also discloses that evidence given at the trial which substantially tended to support the verdict apparently was, in truth, either false or mistaken. It does not appear that any responsible prosecuting officer deliberately produced false and material evidence with knowledge of its falsity. Hence we may not discharge the defendant.

Carter, J., and Traynor, J., concurred.