[Crim. No. 3132.   First Dist., Div. One.   May 18, 1955.]

In re SCOTT BEAMER, on Habeas Corpus.

Kennedy Jackson for Petitioner.

J. F. Coakley, District Attorney (Alameda County), and L. E. Dayton, Assistant District Attorney, for Respondent.

PETERS, P. J.—Beamer was charged with and convicted of a violation of sections 510 and 511 of the Vehicle Code in that at a designated time and place he drove an automobile upon a public street at 35 miles per hour in a prima facie 25-mile zone.   The sole evidence of Beamer's speed was obtained by the use of an electromagnetic radar speed meter. The municipal court admitted this evidence over Beamer's objection that such evidence was inadmissible under sections 751 and 752 of the Vehicle Code.   He was sentenced to a fine or imprisonment.   The Appellate Department of the Superior Court affirmed the conviction by a two-to-one vote. (*People* v. *Beamer,* 130 Cal.App.2d Supp. 874 [279 P.2d 205].) Beamer seeks to review the propriety of his conviction by this proceeding in habeas corpus.

The district attorney urges that, regardless of whether the speed meter evidence was or was not admissible, the propriety of the conviction cannot be determined in this habeas corpus proceeding. ■ Habeas corpus is, of course, a writ that normally is limited to testing the jurisdiction of the court. It does not have the scope of an appeal (*In re Schunke*, 81 Cal.App.2d 588 [184 P.2d 700]) and ordinarily cannot be used to review mere irregularities or errors committed by a court within the scope of an admitted jurisdiction. (*In re Lindley*, 29 Cal.2d 709 [177 P.2d 918].) The district attorney correctly points out that the municipal court had jurisdiction of the person and subject matter, and that the superior court had jurisdiction to review on appeal.

However, the present case does not involve a "mere" ruling on the admission of evidence. Here the sole evidence to support the conviction consists of the challenged evidence. If such evidence was inadmissible there is no lawful evidence upon which the court was entitled to act. Because we have concluded that in any event the writ should not issue, and in view of the broad expansion of the scope of the writ made by the appellate courts in recent years (*In re Byrnes*, 26 Cal.2d 824 [161 P.2d 376][1]; *In re Bell*, 19 Cal.2d 488 [122 P.2d 22]; *Rodman* v. *Superior Court*, 13 Cal.2d 262 [89 P.2d 109]; *In re Silverstein*, 52 Cal.App.2d 725 [126 P.2d 962]), and because of the public importance of the question, and for the reason that this is the only way the cause can be taken to an appellate court, we will assume jurisdiction. This conclusion makes it unnecessary to pass on the constitutionality of section 753 of the Vehicle Code which, by express terms, purports to deprive any court of "jurisdiction to render a judgment of conviction . . . if such court admits any evidence" secured by means of a speed trap. The constitutionality of that section has never been passed upon, and we do not pass upon it in this opinion.[2]

The basic question involved is whether the method of checking speed here employed constitutes a "speed trap" as that term is defined in the California Vehicle Code.

---

[1]In that case, at page 827, the Supreme Court held that the "writ may be used to present questions of law that cannot otherwise be reviewed or are so important as to justify an extraordinary remedy."

[2]In *People* v. *Stewart*, 107 Cal.App.Supp. 757, 759 [288 P. 57], the point was raised. The court stated that "in view of the conclusion to which we have come as to its interpretation, we do not deem it necessary for the purposes of this case to express any opinion on the constitutional question."

Section 751 of the code provides:

"(a) No peace officer or other person shall use a speed trap in arresting, or participating or assisting in the arrest of, any person for any alleged violation of Division IX of this code nor shall any speed trap be used in securing evidence as to the speed of any vehicle for the purpose of an arrest or prosecution under this code.

"(b) A speed trap within the meaning of this chapter is a particular section of a highway measured as to distance and with boundaries marked, designated or otherwise determined in order that the speed of a vehicle may be calculated by securing the time it takes said vehicle to travel such known distance.

"(c) No evidence as to the speed of a vehicle upon a highway shall be admitted in any court upon the trial of any person for an alleged violation of Division IX of this code when such evidence is based upon or obtained from or by the maintenance or use of a speed trap."[3]

Section 752, subdivision (a), provides: "In any prosecution under Division IX of this code upon a charge involving the speed of a vehicle every officer or other person shall be incompetent as a witness if the testimony of such officer or person is based upon or obtained from or by the maintenance or use of a speed trap." Subdivision (b) of this section makes incompetent, with certain exceptions, the testimony of an officer in a speeding case unless such officer was dressed in a distinctive uniform and operating a motor vehicle painted a distinctive color. (See *People* v. *Stewart*, 107 Cal.App. Supp. 757 [288 P. 57].) This portion of the section is not here involved because all of the officers involved were dressed in uniform, and the automobile upon which the speed meter was mounted was painted distinctive colors usually used on police cars. It should also be mentioned that this police car was parked at the curb in plain view of all using the roadway.

Judge Hoyt, in the majority opinion of the Appellate Department of the Superior Court, fully and properly described the ·radar device here used in the following language (130 Cal.App.2d Supp. 874, 875 [279 P.2d 205]):

---

[3]The substance of this section was first added to our law, as was § 752, as § 155 of the Vehicle Act in 1923 (Stats. 1923, p. 567, chap. 266), and both sections as subsequently amended became part of the Vehicle Code in 1935. Section 752, quoted *infra*, reads as the section was amended in 1949.

"Three experts testified as to the electronic principles underlying the operation of this device. Their testimony was to the effect that basically it consists of an ultrahigh frequency radio transmitter and receiver operating on a frequency of 2445 megacycles, a visual speed indicator calibrated to show miles per hour, and a graphic recorder on which speed in miles per hour is recorded.

"Electromagnetic waves traveling at the speed of light are beamed from the transmitter by means of a directional antenna. The crests of these waves are approximately 2.1 inches apart. When these waves hit a solid object they are reflected or bounced back to the receiver. The reflected waves travel at the same speed as the outgoing waves. If the object reflecting the waves back to the receiver is standing still, the same number of waves are received per second by the receiver as are transmitted per second by the transmitter. If the object reflecting the waves is moving away from the transmitter and receiver, each succeeding transmitted wave travels a slightly greater distance than the preceding wave, and each reflected wave travels the same increased distance, with the result that the number of reflected waves returning to the receiver in any given time period is decreased in direct proportion to the speed with which the reflecting object is moving away from the transmitter and receiver. The device then electronically compares the transmitter frequency with the decreased frequency with which reflected waves return to the receiver, and from this comparison registers the speed with which the reflecting object is moving away from the transmitter and receiver on a visual dial calibrated in miles per hour.

"Similarly, when the reflecting object is moving toward the transmitter and receiver, the distance traveled by each succeeding wave is reduced in direct proportion to the speed with which the reflecting object is moving toward the device, with the result that the number of reflected waves returning to the receiver in any given time period is increased in direct proportion to the speed with which the reflecting object is moving toward the transmitter and receiver. The device then electronically compares the transmitter frequency with this increased frequency with which reflected waves return to the receiver and determines from this comparison the speed with which the reflecting object is moving toward the transmitter and receiver, and registers that speed on the visual

dial. The speeds obtained are likewise recorded upon the graphic recorder.

"The device will work equally well whether the reflecting object is approaching or moving away from it. It is not necessary for the device to be stationary. If it is moving, the speed of its movement must be added to or subtracted from the speed of the reflecting object as registered on the speed indicator, depending upon whether the device is moving toward or away from the reflecting object."

The expert evidence also was to the effect that the machine is simple to operate, is remarkably accurate within a range of 175 feet, and can measure the speed of a moving vehicle within that range while the vehicle is traveling but a few inches. The experts also pointed out that the machine is fundamentally a counting device, counting the outgoing and incoming waves and calibrating the difference into miles per hour. The police evidence was to the effect that the speed of the Beamer car was determined by the speed meter well within the 175-foot effective range of the device.

Does the use of such machine constitute a "speed trap" as that term is used in section 751? That is the sole question presented in this proceeding. The answer to that question depends not simply upon determining whether the methods here employed constituted a "speed trap" generally, but upon whether such methods constituted a "speed trap" as that term is defined in section 751. That section, and the following one, prohibit the use of only those "speed traps" defined in the statute. There is nothing inherently wrong with "speed trap" evidence, and many states, in the absence of statute, permit its use. California has seen fit to prohibit "speed traps" of a certain defined kind, but only those "speed traps" coming within the definition are prohibited. The validity of the statute within its scope, is beyond doubt. (*Fleming* v. *Superior Court*, 196 Cal. 344 [238 P. 88].)

Of course, when the substance of section 751 of the Vehicle Code was first enacted as section 155 of the Vehicle Act in 1923, the Legislature did not have in mind radar devices, for the obvious reason that radar, for such purposes, had not yet been developed. That fact, while of importance, is not conclusive because if the statute, reasonably interpreted, includes such devices they are barred whether in existence when the statute was passed or not.

The use of radar to compute speed is of such recent origin that there is but little case law on the subject gen-

erally, and none at all in this state. The cases from outside this state have not dealt with the problem here involved. Most of them are concerned with whether judicial notice can be taken of the nature of the machine, of its accuracy, or how it operates. All the decided cases hold that expert testimony is necessary on this subject, but where such evidence has been produced the cases have quite generally upheld the use of such devices.[4]

The only type of "speed trap" prohibited by section 751 has four characteristics: (1) A particular section of a highway, (2) measured as to distance, (3) with boundaries marked, designated or otherwise determined, and (4) the speed of the vehicle calculated by computing the time it takes the vehicle to travel the known distance. If any one of these elements is absent the device does not fall within the prohibition of the section.

■ It seems quite clear that the method here used to secure the evidence that petitioner was violating the law does not fall within the prohibition of section 751. In no real sense was there "a particular section of a highway measured as to distance and with boundaries marked, designated or otherwise determined." While in a general sense a particular portion of the street was involved in that the effective range of the speed meter is the 175 feet effective range, forwards and backwards, from the device, that cannot be the "particular section of a highway" mentioned in the code because only a very small portion of that section of the highway was used to ascertain the speed. Certainly, the boundaries of the area used to measure the speed were not "marked, designated or otherwise determined," because any few inches of the roadway within the effective range of the device could be used for measuring purposes. The device may be used anywhere on the highway wherever the device is located, whether stationary or on a moving vehicle. It is obvious that section 751 was passed to meet a particular evil existing in 1923 of enforcement officers physically marking a portion of a highway and then, while in hiding, "clocking" the suspect car as it passed over that marked area. (*Fleming* v. *Superior Court,* 196 Cal. 344 [238 P. 88].) That evil does not here exist.

---

[4]For two excellent discussions of the general problem and of the cases from outside California on the general subject see *"Radar in the Courts"* by D. W. Woodbridge in 40 Va.L.Rev. 809 (1954), and *"Radar Traffic Controls"* by C. H. Langschmidt, Jr., in 23 Tenn.L.Rev. 784 (Feb., 1955).

Petitioner's basic argument is that the speed meter falls within the prohibition of section 751 because it measures the distance a vehicle travels on the highway and computes the time it takes the vehicle to travel that distance. The argument proves too much. If correct, it would mean that no one could be arrested for speeding, because speed, in every case, necessarily, by very definition, is the distance traveled in a certain time. No one could reasonably contend that when an officer "clocks" a speeding vehicle by following it and checking its speed by the speedometer on the officer's car, such evidence is inadmissible under section 751. Obviously, the officer, in such event, is measuring the distance the suspected vehicle travels in a certain time, because that is precisely what a conventional speedometer does. If petitioner's argument that any device used to ascertain speed that measures distance divided by time is prohibited, then all evidence of speeding based on speedometer "clocking" would be prohibited. Obviously, section 751 was never intended to have that result.

Counsel for petitioner refers to the statement appearing in *Fleming* v. *Superior Court,* 196 Cal. 344, 349 [238 P. 88], to the effect that in passing the predecessor section of section 751 the Legislature "clearly expressed its conviction that the presence of traffic officers actually patrolling the highways dressed in distinctive uniforms and in plain sight of all travellers on the highways would have a most salutory effect in securing the observance of each and all of the regulations imposed upon drivers of vehicles upon the public highways." We agree, generally, with that statement. In the instant case the officers were all dressed in uniform. The automobile upon which the speed meter was mounted was properly painted and was parked at the curb in plain view of all persons using the street. The motorcycle used in making the arrest was properly painted and openly patrolling the highway.

For the foregoing reasons the writ is discharged and the prisoner remanded to custody.

Bray, J., and Wood (Fred B.), J., concurred.