# IN THE SUPREME COURT OF CALIFORNIA

In re WILLIE SCOGGINS
on Habeas Corpus.

S253155

Third Appellate District
C084358

Sacramento County Superior Court
08F04643

---

June 25, 2020

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger, and Groban concurred.

---

In re SCOGGINS

S253155


Opinion of the Court by Liu, J.


In 2008, petitioner Willie Scoggins planned an unarmed assault and robbery that resulted in a death. In 2011, a jury convicted Scoggins of first degree murder (Pen. Code, § 187, subd. (a)) and attempted robbery (*id.*, §§ 211, 664). It also found true the special circumstance allegation that the murder was committed during an attempted robbery (*id.*, § 190.2, subd. (a)(17)) and the enhancement that a principal was armed during the commission of the offenses (*id.*, § 12022, subd. (a)(1)). Scoggins was sentenced to life imprisonment without the possibility of parole. After Scoggins's conviction became final, we decided *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which clarified the meaning of the special circumstances statute. We granted review to determine whether Scoggins's conduct supported a robbery-murder special-circumstance finding under *Banks* and *Clark*. We hold that Scoggins did not act with reckless indifference to human life and thus the special circumstance finding must be reversed.

## I.

In June 2008, Scoggins purchased what he believed to be three large flat-panel televisions from Samuel Wilson for $300 each. When Scoggins opened the television boxes, he discovered that they contained packaging paper and wood. Scoggins was angry that he had been swindled by Wilson.

1

Scoggins's girlfriend, Shaneil Cooks, and her friend, Jennifer Kane, met Wilson a few days later by coincidence. After Cooks and Kane told Scoggins about the encounter, Scoggins quickly devised a plan to exact revenge against Wilson:  Cooks and Kane would pretend to be interested in purchasing a television and meet up with Wilson; two of Scoggins's close friends, Randall Powell and James Howard, would hide inside Cooks's van during the meeting; and then Powell and Howard would jump out, "beat the shit" out of Wilson, and get Scoggins's money back.  The plan did not call for Scoggins to be involved in the attack; Scoggins was concerned that Wilson might recognize him from their earlier encounter and thought his presence would raise Wilson's suspicions.  There is no evidence that the plan involved the use of weapons.

Soon after, Scoggins and his friends set the plan in motion.  Cooks and Kane pretended that Kane's mother was interested in buying a television and arranged a meeting with Wilson.  Later that evening, Cooks, Kane, Powell, and Howard went to the parking lot of a strip mall to meet Wilson.  Shortly after they arrived, Powell and Howard stepped out of the van and spoke briefly with Wilson.  Then, Powell pulled out a gun and fired several shots at Wilson.  When Wilson ran, Powell fired a few more shots and killed Wilson.  After that, Powell and Howard got into Cooks's van, and the van sped away from the scene.  Throughout these events, Scoggins, as planned, was not present at the crime scene.  He exchanged numerous phone calls with Powell and Howard in the hour leading up to the shooting and waited at a nearby gas station as the events unfolded.

After the shooting, Scoggins walked over to Wilson and checked if he was still breathing. At that point, several bystanders had already gathered around Wilson and had called the police. After speaking with the bystanders for a while, Scoggins moved his car and returned to the crime scene. The police arrived and interviewed Scoggins as a witness. The officer who interviewed Scoggins described him as cooperative.

Scoggins's first trial ended in a mistrial. At the second trial in 2011, the jury convicted Scoggins of first degree murder (Pen. Code, § 187, subd. (a)) and attempted robbery (*id.*, §§ 211, 664). The jury also found true the special circumstance that the murder was committed during an attempted robbery (*id.*, § 190.2, subd. (a)(17)) and the enhancement that a principal was armed during the commission of the offenses (*id.*, § 12022, subd. (a)(1)). The trial court sentenced Scoggins to life imprisonment without the possibility of parole. The court stayed the imposition of the sentence as to the attempted robbery conviction and the firearm enhancement. The Court of Appeal affirmed the judgment, rejecting Scoggins's claim that insufficient evidence supported the robbery-murder special-circumstance finding. We denied Scoggins's petition for review.

In 2015 and 2016, Scoggins filed several petitions for writ of habeas corpus in the trial court and the Court of Appeal, challenging the sufficiency of evidence supporting the special circumstance finding. These petitions were denied. In May 2016, Scoggins filed a petition for writ of habeas corpus in this court, again challenging the special circumstance finding. We issued an order to show cause, returnable to the Court of Appeal, as to why Scoggins is not entitled to relief in light of *Banks*, *supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522,

both of which were filed after Scoggins's conviction became final.

The Court of Appeal denied relief in a divided opinion. The court observed that *Banks* and *Clark* clarified the meaning of the special circumstances statute as intended by the electorate and that the finality of Scoggins's conviction does not bar him from challenging the special circumstance finding through a petition for habeas corpus. If the undisputed facts rendered Scoggins ineligible for the special circumstance finding, the court explained, then the trial court would have imposed the sentence of life without parole " 'in excess of its jurisdiction' " (*People v. Mutch* (1971) 4 Cal.3d 389, 396 (*Mutch*)), and Scoggins would be entitled to habeas corpus relief. (See *id.* at pp. 395, 396 [where a defendant has been "convicted under a statute which did not prohibit his acts at the time he committed them," "finality for purposes of appeal is no bar to relief, and . . . habeas corpus or other appropriate extraordinary remedy will lie to rectify the error"].)

The court then analyzed whether Scoggins satisfied the two requirements for the special circumstance: major participation in the crime and reckless indifference to human life. (*Banks*, *supra*, 61 Cal.4th at p. 798.) The court concluded that Scoggins was a major participant in the attempted robbery resulting in Wilson's death because Scoggins planned the robbery. The court acknowledged that whether Scoggins acted with reckless indifference to human life was a "closer call" but ultimately concluded that the record supported such a finding. In the court's view, the evidence showed that Scoggins knew about Powell's propensity for violence and that Scoggins did not take steps to minimize risk of violence during the robbery. Justice Renner, in a concurring and dissenting

opinion, agreed that Scoggins was a major participant but concluded that the evidence did not show that Scoggins exhibited reckless indifference to human life.

We granted review.

## II.

At the outset, we consider whether Scoggins's claim is procedurally barred. On direct appeal, Scoggins challenged, as he does here, the sufficiency of the evidence supporting the special circumstance finding. Generally, claims that have been raised and rejected on direct appeal cannot be raised again in a habeas corpus petition. (*In re Waltreus* (1965) 62 Cal.2d 218, 225 ["[H]abeas corpus ordinarily cannot serve as a second appeal."].) In addition, sufficiency of the evidence claims are generally not cognizable on habeas corpus. (*In re Lindley* (1947) 29 Cal.2d 709, 723.)

But, as the Court of Appeal recognized, an exception to these procedural bars applies here. Where a decision clarifies the kind of conduct proscribed by a statute, a defendant whose conviction became final before that decision "is entitled to post-conviction relief upon a showing that his [or her] conduct was not prohibited by the statute" as construed in the decision. (*Mutch, supra,* 4 Cal.3d at p. 392.) "In such circumstances, it is settled that finality for purposes of appeal is no bar to relief, and that habeas corpus or other appropriate extraordinary remedy will lie to rectify the error: 'Habeas corpus is available in cases where the court has acted in excess of its jurisdiction. [Citations.] For purposes of this writ as well as prohibition or certiorari, the term "jurisdiction" is not limited to its fundamental meaning, and in such proceedings judicial acts may be restrained or annulled if determined to be in excess of

the court's powers as defined by constitutional provision, statute, or rules developed by courts. [Citations.] In accordance with these principles a defendant is entitled to habeas corpus if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct.' " (*Id.* at p. 396.)

In *Mutch*, the defendant's conviction under the aggravated kidnapping statute became final before this court issued a decision clarifying the type of conduct prohibited by that statute. (*Mutch*, *supra*, 4 Cal.3d at p. 392.) We determined that there was no material dispute as to the facts relating to his conviction and that his conduct did not constitute aggravated kidnapping under the proper construction of the aggravated kidnapping statute. (*Id.* at pp. 397–399; see *id.* at p. 399 ["on the undisputed facts defendant was convicted of kidnap[ping] under a statute which did not prohibit his conduct at the time" he committed the acts].) Thus, the defendant was convicted in excess of the trial court's jurisdiction and was entitled to post-conviction relief. (*Id.* at p. 399.)

In this case, *Banks* and *Clark* clarified the meaning of the special circumstances statute after Scoggins's conviction became final. There is no material dispute as to the facts relating to Scoggins's conviction. The question is whether on this record Scoggins's conduct is proscribed by the special circumstances statute, as construed in *Banks* and *Clark*. If it is not, then the trial court acted in excess of its jurisdiction when it sentenced Scoggins to life imprisonment without the possibility of parole, and habeas corpus relief would be available.

Penal Code section 190.2, subdivision (d), enacted by initiative in 1990, provides that "every person, not the actual killer, who, with reckless indifference to human life and as a major participant" aids or abets an enumerated felony, including attempted robbery, that results in death may be convicted of special circumstance murder and sentenced to death or to life imprisonment without the possibility of parole. The statute, by its text, imposes an actus reus requirement, major participation in the enumerated felony, and a mens rea requirement, reckless indifference to human life. (*Banks*, *supra*, 61 Cal.4th at p. 798.)

In *Banks*, we explained that the special circumstances statute incorporated the holding of *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). (*Banks*, *supra*, 61 Cal.4th at p. 798.) In *Tison*, the high court addressed the level of culpability required to impose the death penalty on an accomplice to felony murder. (*Tison*, at pp. 145–146.) It held that "major participation in the felony committed, combined with reckless indifference to human life," is sufficient to justify the death penalty. (*Id.* at p. 158.)

Because the language of the special circumstances statute is directly borrowed from that holding, it is instructive to consider the high court's analysis in *Tison* and a related decision, *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*). In *Enmund*, the high court ruled that it is unconstitutional to impose the death penalty on a getaway driver for an armed robbery that results in death. (*Id.* at p. 788.) The court noted that Enmund was a minor participant in the crime and did not intend to kill or have any other culpable mental state. (*Id.* at pp. 791, 801; accord, *Tison*, *supra*, 481 U.S. at p. 149.)

By contrast, the court upheld the death sentences imposed on the defendants in *Tison*, who were major participants in the felonies resulting in death and acted with reckless indifference to human life. (*Tison, supra,* 481 U.S. at p. 158.) The defendants in that case were brothers who helped their father and his cellmate, both convicted murderers, escape from prison. (*Id.* at p. 139.) The brothers armed the two prisoners, locked up the prison guards, and helped the prisoners escape. (*Ibid.*) A few days later, the group got a flat tire and flagged down a passing car for help. (*Id.* at pp. 139–140.) They kidnapped the family that was in the car and robbed them. (*Id.* at p. 140.) The two brothers then guarded the family while their father considered what to do next. (*Ibid.*) Eventually, the father shot all of the family members, and the group of perpetrators left the victims to die without rendering aid. (*Id.* at p. 141.)

In *Banks*, we applied the high court's analysis in *Tison* and *Enmund* and concluded that the evidence was insufficient to support a robbery-murder special-circumstance finding under section 190.2. (*Banks, supra,* 61 Cal.4th at p. 794.) We explained that when analyzing a defendant's culpability under the special circumstances statute, it is important to consider where the defendant's conduct falls on the "spectrum of culpability" that *Enmund* and *Tison* established. (*Id.* at p. 811.) On one end of the spectrum is Enmund, "the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." (*Tison, supra,* 481 U.S. at p. 149.) At the other end is "the felony murderer who actually killed, attempted to kill, or intended to kill." (*Id.* at p. 150.) Because the defendant in *Banks*, like Enmund, was a mere getaway driver in an armed

robbery, we concluded that the evidence was insufficient to show that he was a major participant or acted with reckless indifference to human life. (*Banks*, at pp. 805, 807.) We therefore reversed the special circumstance finding. (*Id.* at p. 811.)

In *Clark*, we similarly held that insufficient evidence supported a robbery-murder special-circumstance finding for a defendant who planned a robbery that resulted in a death. (*Clark*, *supra*, 63 Cal.4th at pp. 610–611.) The defendant in that case planned and organized the robbery of a computer store. (*Id.* at p. 536.) The defendant planned for the robbery to take place after the store closed, when there would be few people in the store, and to involve only one gun without any bullets in it. (*Id.* at pp. 621–622.) But an employee's mother unexpectedly entered the store during the robbery, and the defendant's accomplice shot her with a bullet he had loaded into the gun. (*Id.* at p. 537.) Soon after the shooting, the defendant fled the scene and abandoned his accomplice. (*Id.* at p. 620.) We concluded that although the "defendant had a prominent, if not the most prominent, role in planning the criminal enterprise that led to the death" (*id.* at p. 613), the record did not establish that he exhibited reckless indifference to human life (*id.* at p. 623). We therefore vacated the special circumstance finding. (*Ibid.*)

## III.

*Banks* and *Clark* clarified the meaning of the special circumstances statute after Scoggins's conviction became final. Thus, Scoggins is entitled to habeas corpus relief " 'if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted

9

did not prohibit his conduct.'" (*Mutch*, *supra*, 4 Cal.3d at p. 396.) We find no material dispute as to the basic facts of Scoggins's participation in the attempted robbery resulting in Wilson's death. The question is whether the special circumstances statute as construed in *Banks* and *Clark* prohibited Scoggins's conduct. We conclude on this record that Scoggins did not exhibit reckless indifference to human life and thus his conduct was not within the scope of the special circumstances statute. (Scoggins does not challenge the Court of Appeal's determination that he was a major participant in the crime resulting in Wilson's death, so we do not address that question here.)

Reckless indifference to human life is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death." (*Tison*, *supra*, 481 U.S. at p. 157.) Examples include "the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property." (*Ibid.*) Reckless indifference "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.)

Reckless indifference to human life has a subjective and an objective element. (*Clark*, *supra*, 63 Cal.4th at p. 617.) As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her

actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) As to the objective element, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).) "Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death' " satisfies the statutory requirement. (*Banks*, at p. 808.) Notably, "the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used" is not sufficient to establish reckless indifference to human life. (*Ibid.*; see *Clark*, at p. 623.)

We analyze the totality of the circumstances to determine whether Scoggins acted with reckless indifference to human life. Relevant factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) " '[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Id.* at p. 618, quoting *Banks*, *supra*, 61 Cal.4th at p. 803.)

First, Scoggins did not use a gun, nor did he know that a gun would be used during the felony.  The record shows that Scoggins's plan did not involve shooting Wilson.  As mentioned, Scoggins planned for the assault and robbery of Wilson to be unarmed, and there is no evidence that Scoggins knew that Powell would use a gun.  With respect to this factor, Scoggins was far less culpable than the defendants in *Tison*, who "brought an arsenal of lethal weapons into the Arizona State Prison" to help their father and his cellmate escape.  (*Tison*, *supra*, 481 U.S. at p. 151.)  Indeed, Scoggins was less culpable than the defendant in *Clark*, who expected his accomplice to use an unloaded gun to carry out the robbery.  (*Clark*, *supra*, 63 Cal.4th at p. 613; see *id.* at p. 618 ["The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life."].)

Second, "[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force.  In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . .  [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts.  If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark*, *supra*, 63 Cal.4th at p. 619.)

The defendants in *Tison* were physically present during the entire sequence of events that resulted in the victims'

deaths. (*Tison*, *supra*, 481 U.S. at p. 158.) The Tison brothers flagged down the car containing the victims, kidnapped and robbed them, guarded them while their father decided what to do, and eventually watched their father shoot the victims. (*Id.* at pp. 139–141.) During that time, the defendants knew that their father was debating whether to kill the victims and had ample opportunity to restrain the crime and aid the victims. (*Id.* at p. 140.) Because the defendants did neither, the high court reasoned, they exhibited reckless indifference to human life. (*Id.* at pp. 151–152.)

Here, by contrast, Scoggins was not physically present at the crime scene and was not in a position to restrain Powell once the meeting with Wilson began. Scoggins remained at a nearby gas station during the course of the crime and did not arrive at the crime scene until after the shooting occurred. Moreover, it is not clear whether Scoggins could even see the confrontation between his accomplices and Wilson from his position at the gas station. The record contains two pieces of evidence regarding Scoggins's location: cell tower data and Scoggins's statements to the police. The cell tower data placed Scoggins within a half-mile radius of the crime scene but did not provide any information on his exact location. In his statements to the police, Scoggins denied that he could see the shooting from his location at the gas station. The evidence at trial lends some support to his claim. According to eyewitnesses, Powell and Howard confronted Wilson near Cooks's van, which was parked in the lot next to the gas station. Shell casings recovered after the shooting indicate that Powell was standing on the side of the van opposite from the gas station when he first shot Wilson. Thus, the van would have blocked Scoggins's view of the confrontation between his accomplices and Wilson, leaving

him unaware in real time that Powell was deviating from the original plan. (*Clark, supra,* 63 Cal.4th at p. 619.)

The Attorney General contends that Scoggins could have restrained the crime because he was in constant communication with Powell and Howard before the shooting and could have instructed them to avoid using lethal force. But Scoggins had no reason to give such an instruction; his plan for Powell and Howard to beat up Wilson did not contemplate any use of lethal force, and unlike the Tison brothers, he had no reason to suspect that his accomplices were armed or planning to kill Wilson. (*Post,* at pp. 17–20.) In addition, although Scoggins was in close contact with his accomplices before the shooting, he lacked control over their actions once they arrived on the crime scene, especially given how quickly the shooting occurred. This distinguishes Scoggins from the Tison brothers, who were physically present at the scene where a long sequence of events culminated in murder. (See *Tison, supra,* 481 U.S. at pp. 139–141.)

We emphasize that "physical presence is not invariably a prerequisite to demonstrating reckless indifference to human life." (*Clark, supra,* 63 Cal.4th at p. 619.) "Where, for example, a defendant instructs other members of a criminal gang carrying out carjackings at his behest to shoot any resisting victims, he need not be present when his subordinates carry out the instruction in order to be found to be recklessly indifferent to the lives of the victims." (*Ibid.,* citing *People v. Williams* (2015) 61 Cal.4th 1244, 1281–1282.) Especially in light of emerging technologies, a defendant who plans and directs a murder from afar may be just as culpable as a defendant who is physically present at the scene of the crime. But there is no evidence here that Scoggins instructed

14

his confederates to kill Wilson under any scenario; as noted, Scoggins had planned for the beating and robbery to be unarmed. Nor does the record show that he directed his accomplices to deviate from the plan once they arrived at the crime scene.

A defendant's actions after the shooting may also bear on the defendant's mental state. (*Clark, supra*, 63 Cal.4th at p. 619.) For example, the high court took into account the Tison brothers' failure to render aid to the victims after the shooting when it concluded that they acted with reckless indifference to human life. (*Tison, supra*, 481 U.S. at pp. 151–152.) But we have said that when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state. In *Clark*, the defendant fled the scene and abandoned his accomplice immediately after the shooting. (*Clark*, at p. 620.) We said that the defendant's actions could have suggested either that the defendant rejected his accomplice's actions in committing the shooting or that he wanted to flee the scene as quickly as possible to avoid arrest. (*Ibid*.) Ultimately, we concluded that the "[d]efendant's absence from the scene of the killing and the ambiguous circumstances surrounding his hasty departure make it difficult to infer his frame of mind concerning [the victim's] death." (*Ibid*.)

Here, Scoggins walked over to the crime scene and checked if Wilson was still breathing after the shooting. At that point, other bystanders had already called the police, so there was no occasion for Scoggins to seek further assistance. After the police arrived, Scoggins gave a statement as a witness. There is conflicting evidence as to exactly when Scoggins arrived at the crime scene. Some accounts suggested

that his arrival was delayed, occurring 20 to 30 minutes after the shooting. Other accounts suggested that Scoggins arrived soon after the shooting, perhaps two to five minutes later. Relying on the latter version of events, the Attorney General argues that Scoggins's quick arrival indicates that he had anticipated the shooting and was thus unfazed by it. If Scoggins had not anticipated the outcome, the Attorney General contends, "he would have panicked and left." The Attorney General also argues that Scoggins continued to stay until the police arrived in order to gather information from other bystanders and deflect suspicion from himself.

In this case, as in *Clark*, the ambiguity inherent in the petitioner's actions after the shooting "make[s] it difficult to infer his frame of mind concerning [the victim's] death." (*Clark*, *supra*, 63 Cal.4th at p. 620.) As the Attorney General asserts, Scoggins's calm behavior after the shooting might indicate that he had anticipated the use of lethal force and was thus not entirely shocked by the deadly turn of events. Alternatively, Scoggins's actions might indicate that he in fact intended to check on Wilson and render aid. At the very least, his behavior could suggest that he had not planned for his accomplices to kill Wilson; that is, he might have stayed at the crime scene precisely because he did not think he was culpable for Wilson's death. Overall, Scoggins's actions after the shooting do not weigh substantially in favor of a finding of reckless indifference to human life.

Third, the duration of the interaction between the perpetrators and the victim in this case was very limited. Courts have considered "whether a murder came at the end of a prolonged period of restraint of the victims by defendant" in analyzing the defendant's culpability. (*Clark, supra,* 63

Cal.4th at p. 620.) For example, the defendants in *Tison* kidnapped and guarded the victims at gunpoint while their father decided whether to kill the victims. (See *Tison, supra,* 481 U.S. at p. 151.) Because prolonged restraint of the victims provides " 'a greater window of opportunity for violence' [citation], possibly culminating in murder," it can indicate that the defendant exhibited reckless indifference to human life. (*Clark*, at p. 620.)

In this case, eyewitnesses testified that Powell and Wilson had only a brief conversation before Powell pulled out a gun and shot Wilson. The witnesses estimated that the entire interaction lasted between a few seconds and three to five minutes. Thus, Wilson was not restrained for a prolonged period, and this factor does not weigh in favor of finding that Scoggins exhibited reckless indifference to human life.

Fourth, there is no evidence that Scoggins knew Powell or Howard was likely to use lethal force. A defendant's knowledge of a confederate's likelihood of using lethal force, which may be evident before or during the felony, is significant to the analysis of the defendant's mental state. (*Clark, supra,* 63 Cal.4th at p. 621.) For example, the Tison brothers knew they were helping two convicted murderers escape from prison, one of whom had killed a prison guard during an earlier escape. (*Tison, supra,* 481 U.S. at p. 151.) In addition, after the group kidnapped the victims, the brothers heard that their father was " 'thinking about' " killing the victims. (*Id.* at p. 140.) The Tison brothers thus had advance knowledge that lethal force might be used and "subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id.* at p. 152.)

In this case, there is affirmative evidence that Scoggins did not plan for his accomplices to kill Wilson. At trial, the key prosecution witness testified that Scoggins "was not part of any plan to kill [Wilson]." The prosecutor essentially conceded as much to the jury: During closing argument, the prosecutor said there was no "proof that Scoggins and the group conspired to murder Wilson" and no "evidence of intent to kill by Scoggins."

The Court of Appeal concluded that Scoggins had some knowledge that Powell was likely to use lethal force. It pointed out that during one of Scoggins's police interviews, he claimed he did not know Powell was the shooter but said that if Powell did shoot Wilson, "his hot head got him in trouble." Because Scoggins and Powell were close friends, the court explained, "the jury could have reasonably concluded he was in a position to know Powell was prone to quickly become angry or was easily provoked to violence." The court also said that because Scoggins's plan called for Powell and Howard to "beat the shit" out of Wilson, "using a hothead for that purpose does make a resulting murder more likely than using someone with a more even disposition." The Attorney General echoes those assertions as to Powell and argues that Scoggins knew Howard was likely to use lethal force as well. The Attorney General notes that Scoggins was also close friends with Howard and that Scoggins had said Howard was not one to be "punk[ed]" and would "have [Scoggins's back] through whatever."

We conclude that this evidence does not show that Scoggins knew Powell or Howard was likely to kill Wilson. As Justice Renner observed in his concurring and dissenting opinion, "the fact that after the crime was committed [Scoggins] said, if Powell did shoot Wilson, 'his hot head got

him in trouble' is interesting, but this after-the-fact explanation for Powell's behavior is insufficient to support a conclusion that defendant knew before the felony that Powell was *likely* to inflict either a deadly beating or carry and use a gun." Similarly, Scoggins's comment after the shooting that Howard would "have [Scoggins's back] through whatever" and was not one to be "punk[ed]" is insufficient to show that Scoggins knew before the shooting that Howard was likely to use lethal force.

Even if Scoggins knew that Powell and Howard were prone to some degree of violence, and even though the planned assault of Wilson necessarily contemplated the use of violence, the evidence does not support a finding that Scoggins acted with reckless indifference to human life. As noted, "[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient"; reckless indifference to human life requires "knowingly creating a '*grave risk of death.*'" (*Banks, supra,* 61 Cal.4th at p. 808, italics added.) The degree of risk to human life is crucial to the analysis. We have said that any person who plans or participates in an *armed* robbery can be said to anticipate that lethal violence might be used, given that "roughly 1 in 200 [armed robberies] results in death." (*Id.* at p. 811.) But that fact, without more, does not establish reckless indifference to human life. (*Id.* at p. 808; see *Clark, supra,* 63 Cal.4th at p. 623 [finding insufficient evidence of reckless indifference to life where "there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery"].) Here, Scoggins planned an *unarmed* robbery and assault. That the planned beating never occurred and Scoggins never got his money back shows his

accomplices' deviation from the original plan. The record does not show that Scoggins knew his accomplices were likely to deviate from the plan and use lethal force. We agree with Justice Renner that the evidence in this case "does not suggest an elevated risk to human life beyond those risks inherent in an unarmed beating and robbery."

Fifth, a defendant's efforts to minimize the risk of violence in the commission of a felony is relevant to assessing reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 622.) In *Clark*, we found significant the fact that the defendant arranged for the robbery to take place after business hours, when few employees would be present, and planned for the robbery to involve only one unloaded gun. (*Id.* at pp. 621–622.) But we also noted that the existence of efforts to minimize violence does not necessarily foreclose a finding of reckless indifference to human life. (*Id.* at p. 622 ["a defendant's good faith but unreasonable belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life"].) For example, the Tison brothers made an agreement with their father that no one would get hurt during the prison escape and expressed surprise and regret when their father killed the victims. (*Tison*, *supra*, 481 U.S. at p. 166 (dis. opn. of Brennan, J.).) Despite the brothers' agreement, an objective evaluation of the circumstances suggests that the prison escape was likely to pose serious risks of violence. (*Clark*, at pp. 622–623.)

The Court of Appeal concluded, and the Attorney General argues, that unlike the defendant in *Clark*, Scoggins made no efforts to minimize the risk of violence. They note that Scoggins instructed Powell and Howard to launch a surprise,

two-on-one attack on Wilson and to "beat the shit out of him."
In their view, Scoggins, instead of minimizing the risk of
violence, assured that the robbery would include violence. But,
as Justice Renner explained, "Scoggins's plan included
violence, certainly, but the need to minimize the risk of
violence when planning an unarmed beating is less pressing
than the need to minimize the risk of violence when planning
an armed robbery. The record does not contain any indication
the defendant planned a beating involving the use of weapons.
This fact is, by itself, a significant step towards minimizing the
likelihood that the plan would result in a 'grave risk of death.'"
In addition, Scoggins agreed to have the confrontation take
place in a public parking lot during the daytime, when the
possible presence of witnesses might reasonably be thought to
keep his accomplices within the bounds of the plan. We do not
suggest that planning an unarmed robbery or a robbery
involving the use of non-lethal weapons can never, under any
scenario, show reckless indifference to human life. But under
the circumstances here, this factor does not weigh in favor of
finding that Scoggins acted with reckless indifference to
human life.

Determining a defendant's culpability under the special
circumstances statute requires a fact-intensive, individualized
inquiry. (See *Enmund, supra,* 458 U.S. at p. 798 [when
analyzing culpability, courts must "focus on 'relevant facets of
the character and record of the individual offender'"].) In this
case, Scoggins planned an unarmed assault and robbery, and
his accomplices deviated from that plan and shot the victim
instead. The evidence does not show that Scoggins knew his
accomplices were likely to use lethal force. On the facts here,

we hold that Scoggins did not "knowingly creat[e] a 'grave risk of death.' " (*Banks, supra,* 61 Cal.4th at p. 808.)

## CONCLUSION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.


**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Scoggins

_____

**Unpublished Opinion** XXX NP opn. filed 12/17/18 – 3d Dist.
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S253155
**Date Filed:**  June 25, 2020

_____

**Court:**  Superior
**County:**  Sacramento
**Judge:**  David F. De Alba

_____

**Counsel:**

Victor J. Morse, under appointment by the Supreme Court, for Petitioner Willie Scoggins.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Rachelle A. Newcomb and Tia M. Coronado, Deputy Attorneys General, for Respondent the People.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Victor J. Morse
3145 Geary Blvd., PMB #232
San Francisco, CA 94118-3316
(415) 387-5828

Tia Coronado
Deputy Attorney General
1300 I St., Suite 125
Sacramento, CA 94244-2550
(916) 210-7690