Filed 2/4/22  In re Adcock CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re MARK ADCOCK on Habeas Corpus. | C089547 |
| | (Super. Ct. No. 05F01670) |
| THE PEOPLE, | C089581 |
| Plaintiff and Respondent, | |
| v. | |
| MARK ADCOCK, | |
| Defendant and Appellant. | |

In 2008, a jury convicted petitioner, defendant, and appellant Mark Desmond Adcock of first degree murder.  (Pen. Code, § 187, subd. (a) [statutory section references that follow are to the Penal Code].)  The jury also found true the special circumstance allegations that the murder was committed during a robbery and a burglary.  (§ 190.2, subd. (a)(17)(A), (G).)  Defendant was not the actual killer.  The trial court sentenced

defendant to life imprisonment without the possibility of parole.  This court affirmed the conviction.  (*People v. Adcock* (Mar. 24, 2009, C058167) [nonpub. opn.].)

After defendant's conviction became final, the California Supreme Court decided *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and later *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*) which clarified the meaning of the special circumstance statute.  That statute provides that a person who is not the actual killer but "who, with reckless indifference to human life and as a major participant" aids or abets an enumerated felony that results in a death may be convicted of special circumstance murder and sentenced to death or life imprisonment without parole.  (§ 190.2, subd. (d).)  *Banks* and *Clark* clarified that fact-finders must examine an aider and abettor's personal culpability that led to a death during the commission of a felony before imposing a sentence of death or life without parole, and the Supreme Court provided guidance on how to make that evaluation.  (*Banks, supra*, 61 Cal.4th at pp. 800-803; *Clark, supra*, 63 Cal.4th at pp. 618-623.)

Also subsequent to defendant's conviction, the Legislature adopted Senate Bill No. 1437 (2017-2018 Reg. Sess.; Stats. 2018, ch. 1015, § 4, eff. Jan. 1, 2019) (Senate Bill 1437).  Senate Bill 1437 limited felony murder liability to those who in the course of committing an enumerated felony actually killed someone, aided and abetted the actual killer with the intent to kill, or were a major participant in the underlying felony and acted with reckless indifference to human life.  (§ 189, subd. (e).)  Senate Bill 1437 also provided in section 1170.95 a procedure for defendants previously convicted of felony murder to petition for resentencing if under the amended felony murder statutes they could not have been convicted.

Defendant filed a petition for writ of habeas corpus in the trial court contending that in light of *Banks*, substantial evidence did not support the special circumstance findings that he was a major participant in the robbery and burglary and acted with reckless indifference to human life.  Defendant also filed a petition under section 1170.95

to have his sentence vacated for the same reason. The trial court denied both petitions, finding that neither made a prima facie case for relief.

In C089547, defendant petitions this court for a writ of habeas corpus, contending that substantial evidence does not support the special circumstance findings as clarified in *Banks* and *Clark* that he was a major participant in the underlying felonies and acted with reckless indifference to human life. The petition includes evidence that was not presented at trial. We issued an order to show cause.

In C089581, defendant appeals from the denial of his petition to vacate his sentence under section 1170.95. He contends the trial court erred both procedurally and substantively in denying the petition.

We consolidated the matters for argument and decision.[1]

We deny the petition for habeas corpus, and although the trial court committed procedural error in denying the petition to vacate, we conclude the error was harmless and affirm the trial court's denial of that petition.

### FACTS AND HISTORY OF THE PROCEEDINGS

We repeat the facts of the crime from our opinion on direct appeal.

"*The murder*

"Daryl Sussdorf owned and operated Nugget Auto Sales, a used car dealership in Sacramento. He ran the business by himself, without any employees. He provided the financing for his customers; they would purchase their cars and make payments at the dealership later. Sussdorf recorded the payments on account cards and in a receipt book. When an account was paid off, Sussdorf would deliver the title document to the customer.

---

[1] Because we have consolidated the cases, defendant's request for judicial notice of the records in his direct appeals is moot.

3

"Most of Sussdorf's customers paid with cash, so he often had a lot of cash at the dealership. He commonly carried several hundred dollars in his wallet or pocket. He did not make a bank deposit every day; instead, he would do so after accumulating a lot of money. He kept a moneybag in the office for making deposits.

"The door to the dealership's office locked automatically, so Sussdorf knew who was coming and going. The office had two floors. There were security cameras outside the dealership but they did not work. On two occasions, codefendant Russell Jones had purchased cars from Sussdorf.

"In January 2005, (all of the events described herein occurred in 2005 unless otherwise indicated), Sussdorf's wife was suffering from terminal cancer. Their daughter, Kathy Jenson, was caring for her. Sussdorf and Jenson spoke by telephone approximately five to 10 times per day.

"On January 21, at about 4:15 p.m., Lon'ette Cannon went to the dealership and paid Sussdorf $400. He was alone. Cannon chatted with him for a few minutes and then left at 4:30 p.m.

"Jenson last spoke to Sussdorf at about 5:00 p.m. that evening. After that, she telephoned him several times but he did not answer or return her calls. He would usually arrive home at about 6:45 p.m. or call to say that he was running late.

"By 7:00 p.m., Jenson was very concerned because neither she nor her mother had heard from Sussdorf. She sensed that something was wrong, so she picked up her fiancé, Chris Valenzuela, and went to the dealership. While en route, Valenzuela telephoned 911 and told the Sacramento County Sheriff's Department about the situation.

"Jenson and Valenzuela arrived at the dealership at about 8:15 p.m., and her brother, Dale Sussdorf, arrived soon afterward. Valenzuela started looking around. The office door was locked and the blinds were closed, but Valenzuela could see inside by looking through the gaps between each blind. He saw a large amount of blood and papers scattered about.

4

"Sacramento County Sheriff's Deputy Quis Formoli arrived a few minutes after Jenson and Valenzuela. Dale Sussdorf kicked open the door and Formoli went inside.

"There was blood in many places on the first floor of the building, including on the floor, on the blinds, and under the desk chair. Skull fragments and soft tissue were on a wall, and body tissue was on the floor. In addition, there was blood on the staircase, blood dripping down an upstairs wall, and blood on the upstairs carpet.

"Sussdorf was sitting in a chair on the second floor. His jeans were down below his knees. His head was bleeding profusely and he was gasping for air. He did not respond to Deputy Formoli.

"Deputy Formoli went back downstairs and told Valenzuela about Sussdorf's condition. Valenzuela, who was a firefighter and emergency medical technician, went upstairs with Formoli. They administered first aid until paramedics arrived.

"The paramedics removed Sussdorf's clothing in order to treat him. A detective later examined Sussdorf's jeans and observed that the right rear pocket had been torn from the seams that attached it to the pants. There was no money in any of the pockets.

"Behind the desk on the first floor, sheriff's deputies found an empty tan wallet. It looked very similar or identical to Sussdorf's wallet. A bank bag was present in the office.

"A receipt book was on the desk on the first floor. It contained a receipt dated January 21 for "400" from Lon'ette Cannon. Also on the first floor, deputies found an account card with codefendant Jones's name written in Sussdorf's handwriting. There was blood on the bottom of the card. The card was found with other account cards and was not the only card with blood on it. No money was found in the office.

"Sussdorf had suffered 11 blows to his head. Ten days later, he died of his injuries. The injuries were consistent with blows from a hammer.

5

"*Defendant's admissions to J.B.*

"J.B. met defendant in 1992 or 1993. They lost contact but in 2004 they resumed their social relationship and used heroin together. J.B. later stopped using heroin and underwent Methadone and Cyboxin treatment.

"One day during a telephone conversation, defendant told J.B. that defendant was in trouble. Defendant began to say that he had been with someone who had 'beat[en a] man up side his head . . . with a hammer.' J.B. told defendant to stop talking because the police might be listening, and to speak with him in person instead.

"J.B. then met defendant at the Methadone Clinic in Sacramento, where they both were patients. Defendant told J.B. the following: he and another 'guy' went to 'hit a lick,' which means to rob someone, at an auto dealership. The victim was an old man. They 'stripped' (robbed) the victim and, while they were doing so, defendant's cohort 'went crazy' and started beating the victim with a hammer. This 'spooked' defendant, who went outside and acted as a lookout.

"Defendant told J.B. that he and his companion took $800 from the victim. Afterward, they used the money to purchase crack cocaine and heroin and got high. Defendant did not tell J.B. that the victim had died; J.B. learned that from the news.

"J.B. informed investigator Andre Lemay of the California Department of Justice that he knew about the crime. Lemay put J.B. in contact with the Sacramento Sheriff's Department. J.B. then told Detectives Cabral and Kolb what defendant had told him.

"J.B. later learned that a foundation was offering a $5,000 reward in connection with this crime. He told Lemay that he hoped to qualify for the reward. He could get the reward if there was a conviction.

"In 1998, J.B. had been convicted of felony burglary. Then in 2004, he had been convicted twice of that offense. He served a prison sentence for the 1998 conviction. After that conviction, he became a police informant. He had provided information to

6

Andre Lemay on occasion. He had also provided information to the Oakland Police Department. For his convictions in 2004, he received consideration in sentencing because he was providing information to law enforcement.

"J.B. informed the Sacramento County District Attorney's Office that defendant's friends and family had called him and threatened his life. The District Attorney's Office relocated him for his safety. The office spent about $22,300 on J.B., including moving expenses, hotel stays, periodic rent payments, and return trips to testify. The office does not pay his daily living expenses. That was the only money that J.B. received for providing information about this case.

"*Defendant's arrest and statements to law enforcement*

"On February 23, after speaking with J.B. and obtaining an arrest warrant, Detectives Cabral and Kolb, together with other officers, arrested defendant in San Francisco. During the ride back to Sacramento, defendant waived his *Miranda (Miranda v. Arizona* (1966) 384 U.S. 436) rights and spoke with the detectives. The conversation was recorded but road noise made the recording difficult to hear.

"Defendant told the detectives that he and codefendant Jones walked from Jones's home to the dealership to do a 'lick,' which means a robbery. Defendant waited at the corner while Jones went inside. When Jones came back outside, they walked to a bus stop.

"The detectives interviewed defendant on videotape when they returned to Sacramento. During the interview, defendant said the following: J.B. was a family friend. On the day of the crime, Jones was wearing a puffy black jacket and red gloves. Jones was in Sussdorf's office for a total of 10 to 15 minutes. Jones told defendant that he had hit Sussdorf 'several times' because he did not want Sussdorf to come after him. During the bus ride afterward, Jones showed defendant Sussdorf's wallet, which contained checks from Nugget Auto Sales. Jones took $860 from Sussdorf's pocket, and

7

he and defendant spent it on drugs and a motel room. The duo stayed in the motel from the Friday to the Sunday following the murder. The murder weapon, a hammer, was disposed of there. Jones was worried about blood being on his jacket.

"Defendant told the detectives that a 'lick' was 'like a petty theft' or 'like going into a grocery store.' It also meant getting money from someone. At one point during the interview defendant stated that, prior to the robbery, Jones would not tell him how he was going to get the money. At another point, defendant stated that Jones had told him he might be able to get into the office and grab some cash while the person who worked there was dealing with customers. Defendant did not know that Jones planned to carry out a 'strong-armed robbery.' Defendant denied ever leaving the sidewalk during the robbery, and he told the detectives that they should check the security cameras to verify this.

"Defendant was consistent in his story to the detectives. He expressed willingness to help the detectives, and he volunteered to wear a wire, to make a pretextual telephone call to Jones, or to be placed in a room with Jones and have the conversation recorded. The detectives used the last two techniques.

"It was stipulated that on the day of the attack, defendant and Jones checked into a Motel 6 in Sacramento, checked out two days later, and paid in cash.

"*Searches of Jones's residence*

"Jones's house was searched on the day of his arrest. The search yielded a pair of gloves that were made of red fibers that matched fibers found on Sussdorf's jeans.

"The search also yielded a receipt dated April 21, 2003. 'Daryl' had handwritten on the receipt that he had received $250 from Jones and was still owed $1,158.

"The search also yielded a hammer.

"A few days after the search, detectives returned to the Jones residence and asked Jones's mother whether she had a black puffy jacket. Jones's mother retrieved a black

8

puffy jacket from Jones's bedroom closet. Bloodstains on the jacket contained Sussdorf's DNA. Jones's mother testified that she did not know whose jacket it was, but she had seen Jones wearing a puffy jacket. A photograph of Jones taken the month before the attack appeared to show him wearing the jacket.

"*Defense*

"J.B. had been relocated to Sacramento after having testified in a San Francisco homicide. In an affidavit supporting defendant's arrest warrant, Detective Kolb wrote that J.B. was a 'mercenary informant,' meaning a person who supplies information for money. The affidavit also said that J.B. was known as a reliable informant who had provided reliable information on serious cases in the Bay Area.

"One or two days after the attack, Detective Kolb posted reward notices near the dealership. The notices said that Sussdorf had been brutally assaulted at his place of business. There was news coverage of the crime, and the police held a press conference. At the conference, the police did not release the details of the homicide, such as the fact Sussdorf had been beaten. When J.B. spoke with Kolb, he provided information that had not been released to the public.

"Codefendant Jones did not present any evidence." (*People v. Adcock, supra*, (C058167), pp. 2-10.)

### *Verdict, sentence, and post-trial actions*

Defendant and Jones were tried together before separate juries. As mentioned, defendant's jury convicted defendant of first degree murder and found true special circumstance allegations that the murder was committed within the course of a robbery and a burglary. (§§ 187, subd. (a); 190.2, subd. (a)(17)(A), (G).) The trial court sentenced defendant to state prison for life without parole.

On direct appeal, this court affirmed the judgment. (*People v. Adcock, supra*, (C058167).) The California Supreme Court denied review.

Defendant subsequently filed numerous petitions for habeas corpus. All were denied.

On March 6, 2019, defendant filed the two petitions in the superior court that give rise to this matter. In the petition for habeas corpus, defendant contended that under *Banks*, insufficient evidence supported the jury's findings on the robbery and burglary special circumstances that he was a major participant in the underlying felonies and acted with reckless indifference to human life.

In the second petition, defendant sought to vacate his murder conviction pursuant to section 1170.95. Defendant requested the court appoint counsel for him, as provided in the statute.

The trial court denied both petitions in a single order. The court denied the habeas corpus petition because defendant failed to make a prima facie claim for relief. The evidence this court had relied upon on direct appeal in holding that sufficient evidence supported the special circumstance findings had met the demands of *Banks* and *Clark*.

The trial court denied the section 1170.95 petition without appointing counsel for defendant or receiving briefing from the People. The court found that because defendant failed to establish in his habeas corpus petition that the special circumstance findings should be vacated, his 1170.95 petition also failed. The court also found defendant would be convicted of special circumstance felony murder today on a finding consistent with *Banks* and *Clark* based on the evidence presented at trial that he was a major participant who acted with reckless indifference to human life.

DISCUSSION

I

*C089547*

In his petition for habeas corpus, defendant contends that under *Banks* and *Clark*, insufficient evidence supports the jury's special circumstance findings. He claims that evidence attached to the petition that was not presented at trial, the trial evidence of his statements to detectives, and the lack of evidence showing his personal involvement in the murder establish that under *Banks* and *Clark,* he was not a major participant in the robbery and did not act with reckless indifference to human life.

In its return, the People contend that defendant's petition does not establish a ground for relief. The People ask us to disregard defendant's additional evidence, arguing that our review on this petition is for substantial evidence within the record, not evidence outside of the record, that supports the findings. The People also contend that the evidence in the record supports the special circumstance findings consistent with the requirements of *Banks* and *Clark*. Further, the People claim that the petition is procedurally barred because it is untimely and successive.

A. *Scope and standard of review*

Generally, claims that were raised and rejected on direct appeal cannot be raised again in a habeas corpus petition. (*In re Waltreus* (1965) 62 Cal.2d 218, 225 ["habeas corpus ordinarily cannot serve as a second appeal"].) Also, sufficiency of the evidence claims generally are not cognizable on habeas corpus. (*In re Lindley* (1947) 29 Cal.2d 709, 723.)

However, an exception to these rules allows us to take up defendant's petition. "Where a decision clarifies the kind of conduct proscribed by a statute [such as *Banks* and *Clark* did], a defendant whose conviction became final before that decision 'is

11

entitled to post-conviction relief upon a showing that his [or her] conduct was not prohibited by the statute' as construed in the decision. ([*People v.*] *Mutch* [(1971)] 4 Cal.3d [389,] 392.) 'In such circumstances, it is settled that finality for purposes of appeal is no bar to relief, and that habeas corpus or other appropriate extraordinary remedy will lie to rectify the error: "Habeas corpus is available in cases where the court has acted in excess of its jurisdiction. [Citations.] For purposes of this writ as well as prohibition or certiorari, the term 'jurisdiction' is not limited to its fundamental meaning, and in such proceedings judicial acts may be restrained or annulled if determined to be in excess of the court's powers as defined by constitutional provision, statute, or rules developed by courts. [Citations.] In accordance with these principles a defendant is entitled to habeas corpus if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct." ' (*Id.* at p. 396.)" (*Scoggins, supra*, 9 Cal.5th at pp. 673-674.)

In assessing defendant's claim, we apply the substantial evidence standard of review. "The standard of review for a sufficiency of the evidence claim as to a special circumstance is whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' (*People v. Dickey* (2005) 35 Cal.4th 884, 903; see *People v. Halvorsen* (2007) 42 Cal.4th 379, 419.) The standard is the same under the state and federal due process clauses. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1082-1083.) We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial. (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.)" (*Clark, supra*, 63 Cal.4th at p. 610.)

Defendant, as the petitioner, bears the burden of demonstrating that the special circumstance finding must be vacated for insufficient evidence. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) "[A] postconviction challenge to a special circumstance finding

12

under *Banks* and *Clark* presents a legal question for the reviewing court. ([*In re*] *Miller* [(2017)] 14 Cal.App.5th [960,] 979-980.) The challenge 'does not require resolution of disputed facts; the facts are a given'—the appellate court simply determines if they are sufficient to support the special circumstance finding under the multifactor guidance articulated in *Banks* and *Clark*. ([*Id.*] at p. 980.)" (*People v. Jones* (2020) 56 Cal.App.5th 474, 483, review granted Jan. 27, 2021, S265854.)

This raises the question of whether we will consider the evidence defendant attached to his petition that is outside of the trial record. The evidence consists of an unauthenticated document which purports to be a written statement by the informant, J.B., that he gave to police three years before trial. The statement was not introduced at trial. It differs somewhat from J.B.'s trial testimony. Defendant summarized the statement in his petition.

In the statement, J.B. states that defendant told him he stood outside the dealership as the lookout while his accomplice went inside. Wondering what was taking so long, defendant went into the business office and saw his accomplice beating the victim with a hammer. Defendant told his accomplice, "let's go!" They took $800 from the victim's wallet and left.

Defendant contends that this additional evidence and his statements to police that he never entered the dealership show that the evidence supporting his special circumstance findings is insufficient under *Banks* and *Clark*. He asserts that J.B.'s trial testimony is insufficient to support the findings.

We will not consider the additional evidence. Sufficiency of the evidence review is limited to "the evidence actually presented to the jury." (*People v. Reed* (2018) 4 Cal.5th 989, 1007, fn. 9.) When courts determine whether to grant a petition for habeas corpus based on the application of *Banks* and *Clark* to a prior conviction, we consider "the 'totality of the circumstances' derived from the evidence presented in defendant's trial (*Banks, supra*, 61 Cal.4th at p. 802)[.]" (*In re Miller, supra*, 14 Cal.App.5th at

p. 974.)  By asking us to consider the additional evidence, defendant effectively creates a disputed issue of fact in hope we will reweigh the evidence and make a factual determination on whether he was a major participant in the felonies and acted with reckless indifference to human life.  We, however, do not reweigh evidence, judge its credibility, or resolve evidentiary or factual conflicts when we review for substantial evidence.  The additional evidence will not aid us in determining whether substantial evidence supports the jury's special circumstance findings.  The testimony of a single witness is sufficient to prove any fact.  (Evid. Code, § 411.)

B.    *Merits of the petition*

1.    *Legal background*

The Eighth Amendment's prohibition of cruel and unusual punishments prohibits excessive punishments.  (*Atkins v. Virginia* (2002) 536 U.S. 304, 311 & fn. 7.)  The amendment "encompasses a narrow proportionality principle."  (*Harmelin v. Michigan* (1991) 501 U.S. 957, 997.)  " '[I]t is a precept of justice that punishment for crime should be graduated and proportioned to the offense.'  [Citation.]"  (*Atkins*, at p. 311.)

The proportionality principle's most extensive application has been in death penalty cases.  (*Harmelin v. Michigan, supra*, 501 U.S. at p. 997.)  However, the California Supreme Court has held that its standards for determining death penalty proportionality apply equally to cases like the one before us involving eligibility under section 190.2, subdivision (d) for a sentence of life imprisonment without parole.  (*Banks, supra*, 61 Cal.4th at p. 804.)

In *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), the United States Supreme Court applied the proportionality principle to determine whether imposing capital punishment against a felony murder accomplice who did not kill or a felony murder aider and abettor violated the Eighth Amendment.  The *Enmund* court stated that in determining proportionality, the focus

14

must be on the defendant's culpability. The high court "insist[s] on 'individualized consideration as a constitutional requirement in imposing the death sentence,' [citation], which means that we must focus on 'relevant facts of the character and record of the individual offender.' [Citation.]" (*Enmund*, at p. 798.)

In *Enmund*, the court held that the Eighth Amendment prohibits imposition of the death penalty on a person "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund, supra*, 458 U.S. at p. 797.) The petitioner Enmund was the getaway driver for two people who robbed and murdered a senior couple. He had parked about 200 yards away from the crime scene while the crime occurred. (*Id*. at p. 784.) The high court reversed his death penalty judgment because his participation in the felony murder was too attenuated and there was no proof he had any culpable mental state. He did not kill or intend to kill, and there was no evidence he had intended to participate in or facilitate a murder. (*Id*. at p. 798.)

In *Tison*, the Supreme Court held that an intent to kill was not a required finding to impose the death penalty on a felony murder aider and abettor. (*Tison, supra*, 481 U.S. at pp. 152, 157-158.) In *Tison*, two brothers helped their father and his cellmate, both convicted murders, escape from prison. The brothers entered the prison carrying numerous firearms in an ice chest and they armed the two men. The group brandished their weapons to escape the facility. (*Tison, supra*, 481 U.S. at p. 139.) Later, a tire on the group's car blew out. The group flagged down a motorist, forced him, his wife, their two-year-old son, and their 15-year old niece into the group's disabled car, and drove both cars further into the desert. (*Id*. at pp. 139-140.) The commandeered family was ordered to stand next to the group's disabled car. As the brothers stood by the victims' car, their father and his cellmate shot and killed the family members. The brothers made no effort to help the victims but later stated they were surprised by the shooting. They drove away from the scene in the victims' car. (*Id*. at pp. 140-141.) The Arizona

15

Supreme Court affirmed the brothers' death sentences by interpreting *Enmund* to require a finding of intent to kill and by finding the brothers possessed that intent because it was foreseeable that lethal force might be used or life taken in accomplishing the underlying felony. (*Tison,* at pp. 143-145, 150.)

The Supreme Court vacated the Tison brothers' death sentences. It rejected the Arizona Supreme Court's reformulation of intent to kill as amounting to little more than a restatement of the felony-murder rule. "[T]he possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen . . . ." (*Tison, supra*, 481 U.S. at p. 151; *id.* at pp. 150-151.)

Nonetheless, the *Tison* court held that intent to kill was not a required finding to impose the death penalty on a felony murder aider and abettor. (*Tison, supra*, 481 U.S. at pp. 157, 158.) *Enmund*, in assessing the proportionality of Enmund's death sentence, dealt with two distinct subsets of felony murders. At one pole was Enmund, "the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." (*Tison,* at p. 149.) Capital punishment was disproportionate in those cases. (*Id.* at p. 150.) At the other pole was the felony murderer who actually killed, attempted to kill, or intended to kill. The death penalty in those circumstances did not violate the Eighth Amendment. (*Ibid.*)

The Tison brothers fell "into neither of these . . . categories." (*Tison, supra*, 481 U.S. at p. 150.) They did not intend to kill. However, they fell outside the category of felony murderers for whom *Enmund* held the death penalty to be disproportional. "[T]heir degree of participation in the crimes was major rather than minor, and the record would support a finding of the culpable mental state of reckless indifference to human life." (*Tison,* at p. 151.) The record showed they "subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id.* at p. 152.)

Against a backdrop of state legislatures and courts that approved the death penalty in such aggravated felony murders, the Supreme Court determined that imposing the

16

death penalty in "these midrange felony-murder cases" was not disproportionate under the Eighth Amendment. (*Tison, supra*, 481 U.S. at pp. 155, 157-158.) Critical facets of the individualized determination mandated by *Enmund* were the defendant's mental state and his or her degree of participation in the felony. (*Tison,* at pp. 156-158.) The court held "that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Tison,* at p. 158.) A showing of intent to kill was not required.

In 1990, California voters passed Proposition 115, which sought to codify the holding in *Tison*. The text of new section 190.2, subdivision (d) mirrored the holding of *Tison* and was intended to bring state law into conformity with the case. (*Banks, supra*, 61 Cal.4th at p. 798.) Under the statue, in the case of first degree felony murder, "every person, not the actual killer, who, with reckless indifference to human life and as a major participant" aids or abets the crime may be convicted of special-circumstance murder and punished by death or life imprisonment without parole. (§ 190.2, subd. (d).)

*Tison*, however, did "not attempt to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty . . . ." (*Tison, supra*, 481 U.S. at p. 158.) In *Banks* and *Clark*, the California Supreme Court sought to provide further guidance for determining a felony murder aider and abettor's eligibility for the death sentence or life imprisonment without parole. (*Banks, supra*, 61 Cal.4th at pp. 800-801.)

Under *Tison* and *Enmund*, a sentencing body "must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks, supra*, 61 Cal.4th at p. 801, original italics.) The statute "imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Id*. at p. 798, fn. omitted.)

17

We now apply the California Supreme Court's specific direction to determine whether substantial evidence supports the jury's findings that defendant was a major participant and acted with reckless indifference to human life.

### 2. *Analysis*

#### a. *Major participant*

Regarding the conduct requirement, "*Tison* and *Enmund* establish that a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund. The defendants' actions in [*Tison* and *Enmund*] represent points on a continuum. (*Tison,* at pp. 149-151.) Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility. . . . [A] jury presented with this question must consider the totality of the circumstances." (*Banks, supra*, 61 Cal.4th at p. 802.)

The *Banks* court set forth the following factors which distinguish the Tisons from Enmund and which a finder of fact may consider when determining whether an aider and abettor's culpability was sufficient to make him or her a major participant in the felony and death eligible: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' (*Tison, supra,*

18

481 U.S. at p. 157) was sufficiently significant to be considered 'major' (*id.* at p. 152; see *Kennedy v. Louisiana* [(2008)] 554 U.S. [407,] 421)."  (*Banks, supra*, 61 Cal.4th at p. 803.)

Applying the *Banks* factors here, we conclude defendant was a major participant in the robbery and burglary that led to the victim's murder.  No evidence indicates defendant planned how to rob the victim, but the evidence shows that both defendant and Jones intended to rob the victim.  Defendant told J.B. that he and Jones "went to hit a lick," which means to rob someone.  Defendant told J.B. "[t]hey went there to rob him . . . ."  Defendant told Detective Cabral that he and Jones went to the auto dealership because it "had money there, and they were going to go get some money from that business."  Defendant said they went there "to hit a lick," a street term used to describe a robbery.

There is no evidence that defendant supplied Jones with the hammer or used it himself.  There is also no evidence he was aware that Jones possessed the hammer.  And there is no evidence defendant had any past experience or conduct with Jones that involved violent crime.

However, defendant actively participated in the robbery.  Defendant told J.B. that both he and Jones robbed the victim.  Defendant said he and Jones "stripped this dude and that while they were stripping the guy," Jones began beating the victim.  Defendant told J.B. that he and Jones robbed "somewhere around $800" from the victim.

Most significantly, defendant facilitated the murder.  He was present at the scene of the killing and in a position to facilitate or prevent the actual murder, and his own actions or inaction played a particular role in the death.  Defendant told J.B. that as they were robbing the victim, Jones "went crazy" on the victim and began beating him with a hammer.  Although the attack "spooked" him, instead of attempting to stop the attack, defendant facilitated it by going outside of the building and acting as a lookout.  Defendant told J.B. that he went outside and "looked out," meaning he "[w]atched."  He

19

"went outside and looked out, made sure, you know." "Looked out" was the term defendant used.

During and after lethal force was used, defendant did not go to the victim's aid. Instead, he and Jones left the dealership, used the robbery proceeds to buy crack cocaine and heroin, and got high.

Defendant claims the record does not establish that the jury believed J.B.'s testimony that he was present at the scene of the killing inside the dealership and then left to act as a lookout after the beating started. During closing argument, the prosecutor asserted the special circumstances were true by assuming for argument that defendant remained outside the dealership and asking for true findings even if defendant never entered the building or had been two miles away.

Defendant takes the prosecutor's statements out of context. When the prosecutor made the statements, he was not discussing the felony-murder special circumstance. Rather, he was explaining to the jury the definition and concept of aiding and abetting a crime as they had been instructed and that defendant could be guilty of felony murder as an aider and abettor. In any event, we do not review the evidence to determine if the jury believed J.B. We review for substantial evidence supporting the verdict.

The evidence shows defendant was a major participant in the felonies. He participated in the incident more than the getaway driver in *Enmund* but somewhat less than the Tison brothers in *Tison*. Unlike Enmund, defendant actively participated in the robbery. More similar to the Tison brothers, defendant also facilitated the murder by looking out while Jones continued to attack the victim with the hammer. Becoming a lookout after seeing Jones use lethal force is more culpable than being solely a getaway driver. Defendant did not attempt to stop the attack or come to the aid of the victim. These facts indicate defendant's actions lean closer to the *Tison* side of the *Tison-Enmund* spectrum of culpability.

20

When viewed under the clarification provided by *Banks*, the record contains substantial evidence that supports the jury's determination that defendant was a major participant in the underlying felonies.

b. *Reckless indifference to human life*

The requirements of being a major participant and acting with reckless indifference "significantly overlap . . . in general, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life." (*Tison, supra*, 481 U.S. at p. 153.) There are some felonies as to which one could conclude that any major participant necessarily exhibits reckless indifference to human life. (*Id.* at p. 158, fn. 12.) However, the California Supreme Court has determined that armed robbery, by itself, is not one of those felonies. (*Banks, supra*, 61 Cal.4th at p. 810, fn. 9.)

Regarding the mental component of culpability, "*Tison,* and in turn section 190.2(d), look to whether a defendant has ' "knowingly engag[ed] in criminal activities known to carry a grave risk of death." ' (*People v. Estrada* [(1995)] 11 Cal.4th [568,] 577, quoting *Tison, supra,* 481 U.S. at p. 157.) The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801.)

The Supreme Court in *Clark* and *Scoggins* provided additional guidance on determining reckless indifference: Reckless indifference to human life has a subjective and an objective element. (*Clark*, *supra*, 63 Cal.4th at p. 617.) As to the subjective element, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed," and he or she must consciously disregard "the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) As to the objective element, " '[t]he risk [of death] must be

21

of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death' " satisfies the statutory requirement. (*Banks*, at p. 808.) Notably, "the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used" is not sufficient to establish reckless indifference to human life. (*Ibid.*; see *Clark*, at p 623.)

"We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life. Relevant factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? (*Clark*, *supra*, 63 Cal.4th at pp. 618-623) ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' (*Id.* at p. 618, quoting *Banks*, *supra*, 61 Cal.4th at p. 803.)" (*Scoggins, supra*, 9 Cal.5th at p. 677.)

The evidence in the record does not support a number of these factors. There is no evidence that defendant used a weapon or knew prior to the robbery that any kind of weapon would be used. The record discloses that only one weapon was used, and it was used by Jones. There is no evidence that defendant knew of Jones having a propensity for violence or the likelihood that Jones would use lethal force. The duration of the

offense was 10-15 minutes. However, the finding of reckless indifference does not require a finding under each of the *Clark* factors. No one of them is necessary.

The evidence we rely on to support the finding that defendant was a major participant also sufficiently supports the finding that defendant acted with reckless indifference. Defendant was physically and intentionally present at the scene. He told J.B. that Jones started beating the victim with a hammer "while they were stripping [robbing] the guy[.]" Jones "went crazy on the dude." On cross-examination, J.B. stated that defendant said Jones "started beating the man up side his head with a hammer." Defendant told J.B. that seeing Jones beat the victim with a hammer "spooked him" and scared him. At that point, aware that lethal force was being used as part of the robbery in which he was participating, defendant made no effort to minimize the risk of violence, restrain Jones, or aid the victim. Instead, he went outside to be a lookout.

This evidence satisfies the subjective and objective elements of reckless indifference. Upon seeing Jones go "crazy on" the victim by attacking him with a hammer during the robbery and becoming a lookout, defendant consciously disregarded the risk of death his action of being a lookout created. Subjectively, he knew that lethal force was being used, and becoming a lookout without stopping Jones from hitting the victim in the head with a hammer in the manner he was hitting the victim would likely result in the victim's death. Objectively, defendant's disregard of these facts and becoming a lookout instead of staying inside to attempt to abate the violence or aid the victim was a gross deviation from the standard of conduct that a law-abiding person would observe in the defendant's situation.

Defendant contends the evidence does not support a conclusion that he reasonably would have succeeded if he had tried to intervene physically in the beating or save the victim's life. Defendant was unarmed, and he assertedly had no reason to believe Jones would continue the beating. The relevant issue, however, is not whether he would have reasonably succeeded. The issue is whether a law-abiding person in defendant's

23

situation, aware of Jones's actions and the victim's risk of death, would have done nothing other than become a lookout for the actual killer. We believe not.

Substantial evidence in the record, reviewed for consistency with *Banks* and *Clark*, supports the jury's determination that defendant was a major participant in the underlying felonies and acted with reckless indifference to human life. The imposition of the special circumstance sentence on defendant is thus not disproportional and violative of his Eighth Amendment rights. We will deny the petition for habeas corpus. Because we have decided the petition on the merits, we need not address the People's procedural arguments.

## II

### C089581

Defendant appeals from the trial court's denial of his petition under section 1170.95 to vacate his sentence. He contends the trial court erred procedurally by not appointing counsel for him, not issuing a show cause order, and by not conducting a hearing after defendant made a prima facie showing for relief. He also claims the trial court erred substantively by relying on this court's opinion on his direct appeal which did not review the sufficiency of the evidence based on *Banks* and *Clark*, and because insufficient evidence supports the finding that he was a major participant who acted with reckless indifference to human life.

Defendant correctly claims that the trial court erred procedurally, although not as defendant argues. The California Supreme Court in *People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*) recently clarified the procedural requirements for making a prima facie determination under section 1170.95. Pursuant to that statute, a convicted felony murderer who could not be convicted under the amended felony murder statutes may retroactively seek relief by filing a petition in the sentencing court. The petition must state whether the petitioner seeks the appointment of counsel. (§ 1170.95, subd.

24

(b)(1)(C).) "[P]etitioners who file a complying petition requesting counsel are to receive counsel upon the filing of a compliant petition." (*Lewis,* at p. 963.)

The People have 60 days after service of the petition to file a response, and the petitioner has 30 days from that point to file a reply. (§ 1170.95, subd. (c).) After the appointment of counsel and briefing, the court determines whether the petitioner has made a prima facie showing. This inquiry is limited. The court must take the petitioner's factual allegations as true and make a preliminary assessment whether the petitioner would be entitled to relief if his or her factual allegations were proved. If the court determines the petitioner would be entitled to relief, it must issue an order to show cause. (§ 1170.95, subd. (c); *Lewis, supra*, 11 Cal.5th at p. 971.)

" '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' [Citations.]" (*Lewis, supra*, 11 Cal.5th at p. 971.)

The trial court erred by determining that defendant had not stated a prima facie case without first providing counsel and receiving briefing. The error is statutory error, not constitutional error. (*Lewis, supra*, 11 Cal.5th at pp. 972-973.) As a result, it is reviewed for prejudice under the *Watson* standard of review. (*Lewis,* at p. 974; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) Under that standard, defendant must demonstrate there is a reasonable probability that in the absence of the error, he would have obtained a more favorable result. (*Ibid.*) "More specifically, a petitioner 'whose petition is denied before an order to show cause issues has the burden of showing "it is reasonably probable that if [he or she] had been afforded assistance of counsel his [or her] petition would not have been summarily denied without an evidentiary hearing." ' [Citation.]" (*Lewis*, at p. 974.)

25

Defendant cannot make the required showing of prejudice. Denying defendant's petition for writ of habeas corpus, we have rejected the argument defendant makes in his section 1170.95 petition and have determined as a matter of law that substantial evidence supported his special circumstance findings as those findings were interpreted under *Banks* and *Clark*. There is nothing appointing a lawyer would have or could have done to change that.

Defendant asserts that the trial court erred by relying on this court's opinion on his direct appeal even though we did not affirm the sufficiency of the evidence based on *Banks* and *Clark* in that opinion. He also claims that in any event, insufficient evidence supports the finding that he was a major participant who acted with reckless indifference to human life. Having just determined on the habeas corpus petition that substantial evidence supports the special circumstance findings consistent with the directives set forth in *Banks* and *Clark*, we affirm the trial court's ruling on the petition's merits based on our analysis in C089547 without further discussion. As a result of our denying habeas corpus, the issue of the trial court's relying on our opinion on direct appeal is moot.

## DISPOSITION

In C089547, the petition for writ of habeas corpus is denied.

In C089581, the judgment denying the petition to vacate defendant's sentence under section 1170.95 is affirmed.

HULL, Acting P. J.

We concur:


DUARTE, J.


RENNER, J.

26